## QUAKER OATS CO. v. FEDERAL SECURITY ADMINISTRATOR.
### No. 7765.

Circuit Court of Appeals, Seventh Circuit.
June 26, 1942.

Geo. I. Haight, Ward Ross, William D. McKenzie, and James M. Best, all of Chicago, Ill. (Merrill E. Olsen, of Chicago, Ill., of counsel), for petitioner.

Wendell Berge, William W. Barron, and Louis B. Schwartz, all of Washington, D. C. (Edward B. Williams and William W. Goodrich, both of Washington, D. C., of counsel), for respondent.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition for review of respondent's order, entered May 26, 1941, promulgating regulations fixing and establishing definitions and standards of identity for "farina" and "enriched farina" and numerous related flour mill products.

The authority relied upon by respondent is contained in Section 341, Title 21, U.S.C.A., entitled "Definitions and Standards for Food." (Section numbers used in this opinion refer to U.S.C.A.) The section, so far as here material, provides: "Whenever in the judgment of the Administrator such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity, a reasonable standard of quality, and/or reasonable standards of fill of container: * * *".

The Administrator, after notice and hearings participated in by members representing the pertinent industry, as well as consumer representatives, adopted findings of fact and concluded on the basis thereof that the regulations included in his order would promote honesty and fair dealing in the interest of consumers. Then follows the regulations fixing standards for a large number of flour products, as well as those involved in this proceeding, namely "farina" and "enriched farina." The former, designated as Reg. 15.130, defines farina as the food prepared by grinding and bolting clean wheat, other than durum wheat and red durum wheat, to a prescribed fineness, with bran coat and germ removed to the extent that the percentage of ash in the final product, calculated to a moisture free basis, does not exceed .6 percent. The latter, designated as Reg. 15.140, defines enriched farina as conforming to the standard fixed for farina, except that it contains prescribed minimum quantities of vitamin $B_1$, riboflavin, nicotinic acid, and iron. Enriched farina, under the Administrator's standard, may contain as optional additional ingredients vitamin D, calcium, wheat germ, and disodium phosphate.

While there is some disagreement as to the contested issues involved, we think they may be fairly summarized by petitioner's contention, disputed by respondent, that each of the regulations is unreasonable, that they do not promote honesty and fair dealing in the interest of consumers, and are not supported by substantial evidence. Furthermore, it is contended by petitioner that respondent was without authority to promulgate a regulation concerning enriched farina which had not been marketed theretofore, that the notice of the hearing did not purport to authorize the reception of evidence concerning such standard and that, as a matter of fact, evidence was not received

pertinent thereto. It is also contended with respect to both standards that respondent, in administering the Act, has reached an unconstitutional result.

■ The basis upon which we think this case must be decided makes it unnecessary to enter into a discussion as to the character of notice given by respondent. It is sufficient to state that while petitioner's contention is not without merit, yet we are of the view that its participation in the hearings, both the original and the adjourned, were such as to preclude it from successfully invoking such issue. Likewise, we think it is unnecessary to enter into a discussion of petitioner's contention that the findings are without substantial support. For the purpose of this opinion (with certain exceptions noted hereinafter) we accept them.

■ It is, therefore, sufficient to summarize the findings as made by respondent. A major portion of the hearings was devoted to the numerous grades of flour and only a minor portion to farina. As a consequence, most of the findings, strictly speaking, pertain to flour, which petitioner contends have no relevancy to farina and were, therefore, improperly included in the record. It must be conceded, we think, that there is such a close relationship between flour or, at any rate, some of the grades thereof, and farina, that it would be impractical, if not impossible, to consider the evidence and findings concerning the latter without giving consideration to the former.

Farina is a product obtained by grinding wheat and separating the bran coat and germ of the grain from the endosperm. It consists essentially of endosperm in particles larger than permissible in flour, the size of the particles being the principal characteristic distinguishing the product from flour. In fact, it corresponds substantially to a fine grade of white flour known as "Patent Flour." It is used as a breakfast food, as an ingredient of macaroni products and extensively as a cereal food for children.

It was found that the removal of the bran coat and germ in the manufacture of flour and farina eliminates those parts of the wheat which are richest in vitamins and minerals. It was also found there exists a serious and widespread nutritional deficiency in children, as well as in adults, of vitamin $B_1$, riboflavin, nicotinic acid, iron, calcium and vitamin D. These elements are available as synthetic compounds and are suitable for the enrichment of flour and farina. It was further found that vitamin D and calcium are used singly as enrichments of flour and farina, but consumer education has generally recommended dairy products as the most desirable source of the calcium and milk as the product most suitable for enrichment with vitamin D. It was found, however, that the addition of D and calcium as optional ingredients in enriched flour and enriched farina would be useful for those who consume insufficient dairy products.

It was found that manufacturers have recently placed on the market flours and farinas enriched with one or more of these nutritional elements.[1] The composition of these enriched products varies widely, so it is found, and unless a standard limiting the kinds and amounts of enrichment is adopted, the manufacturers' selection of nutritional elements is likely to lead to a great diversity of enrichments, both quantitative and qualitative. Such diversity would tend to confuse and mislead consumers as to the relative value and need of the several nutritional elements, and would impede rather than promote honesty and fair dealing in the interest of consumers. Indiscriminate enrichment with vitamins and minerals would tend to confuse and mislead consumers by giving rise to conflicting claims regarding the beneficial effects of various vitamins and minerals, and would be likely to lead to the impression on the part of consumers that a single article of food, so enriched, would meet all nutritional needs.

It was also found that, pending experience with the use of enriched flour and enriched farina, consumer education and understanding would be facilitated by restriction of enrichment with respect to the ingredients and, as to farina, the minimum amounts of such ingredients. The findings further recite that flour and farina enriched with vitamins and minerals have not acquired common or usual names, but that such products may be accurately designated as "enriched flour" and "enriched farina."

Upon the basis of such findings, respondent concluded that it would "promote

---

[1] This finding must refer largely to flours, as the record discloses only two farinas to which vitamins have been added.

honesty and fair dealing in the interest of consumers" to adopt the standards of identity for farina and enriched farina embodied in the regulations in controversy. The record discloses certain other evidence not specifically covered by the findings, but not inconsistent therewith, to which we briefly refer.

Petitioner has, since April, 1932, sold its product, labeled on the front panel of the package, "Quaker Farina Wheat Cereal, enriched with vitamin D," or "Quaker Farina enriched by the Sunshine Vitamin." On the back panel of the package is the following description: "contains 400 U. S. P. units of Vitamin D per ounce, supplied by approximately the addition of ⅛th of 1 per cent irradiated dry yeast."

During such period it has sold millions of packages annually and its product is of national reputation.

Vitamin D functions in regulating the metabolism of calcium and phosphorus in the body and is, therefore, concerned with the proper formation of bones and teeth. It is recognized as especially beneficial in the infant and growing child as a preventative and therapy of rickets and the building of strong bones and teeth. It is also an essential vitamin for adults. There is medical testimony to the effect that of all the known vitamins, it is the one most deficient in normal diet and should, therefore, be supplied in foods which are consumed regularly by the great mass of population, particularly those in the low income groups. While the Administrator found that milk was the most appropriate carrier for vitamin D, it is not disputed but that farina is also a proper carrier. Vitamin D in nature is found almost exclusively in sunshine and certain fish livers which are unavailable to humans in the normal diet. Therefore, as we understand, this vitamin is deficient in ordinary food products except when artifically supplied.

Thus, we have a situation where farina, with the addition of vitamin D, as manufactured and marketed by petitioner, is admittedly a wholesome and healthful product (it is admitted in respondent's brief that vitamin D is a beneficial substance), and that it has been sold to millions of consumers, without deception, fraud or misrepresentation of any kind or character. As already pointed out, the regulations in question permit the manufacture and sale of plain farina and enriched farina. The regulation as to the former, in effect, prohibits petitioner from the sale of farina to which vitamin D has been added, as has long been its practice. The regulation as to the latter permits the use of vitamin D as an optional ingredient in connection with other vitamins, the use of which is mandatory.

Respondent criticizes, without merit we think, petitioner's treatment of the standards as separate and distinct. It is said they must be considered together, or, at any rate, with reference to each other. Such consideration, however, as we view the matter, furnishes little, if any, assistance to respondent's cause.

This brings us to what we regard as the heart of the controversy, embracing the issue as to respondent's authority to promulgate the regulations in dispute. Closely allied therewith is the question as to the reasonableness of the regulations, even if found to be within the authority conferred by the Act.

We assume there could be no dissent from the proposition that an administrative agency has only such authority in the administration of a Congressional enactment as is expressly conferred, or as may be reasonably implied. Prior to discussing the matter of respondent's authority, we again refer briefly to the findings of fact by which we are bound, if supported by substantial evidence. Sec. 371(f) (3). As already noted, we accept the findings with certain exceptions, one of which may, or may not, be a finding, viz., that the regulations in suit will promote honesty and fair dealing in the interest of consumers. We assume from respondent's argument that this is regarded as a finding of fact, notwithstanding its being labeled as a conclusion and predicated upon the facts as found. Other than this labeled conclusion, the only reference in 92 findings to honesty and fair dealing is found in connection with the discussion as to the diversity of products of various manufacturers which, it is found, would "tend to confuse and mislead consumers * * * and would impede rather than promote honesty and fair dealing in the interest of consumers." The conclusion that the regulations will promote honesty and fair dealing comes closer, in our judgment, to being one of law than of fact. If so, we are not bound to accept it. On the other hand, if it be considered as a finding of fact, we are of the view that it is without substantial support.

All of the findings, labeled as such, as well as respondent's argument before this court, are bottomed upon the premise that the standards in controversy are authorized because they are in the interest of the consumer. As stated in his brief: "The real issue, of course, is whether the requirements of the regulation are reasonably related to the promotion of consumers' interests. * * *"

A study of the record leaves no room for doubt but that the hearing revolved largely around consumer interest as it related to health. In referring to the ingredients of enriched farina, it is stated in respondent's brief: "They are essential to the health and well being of our nation." In support of the regulations it is also suggested that they will prevent confusion among consumers as to their nutritional needs. In this regard, respondent states: " * * * Indiscriminate enrichment with vitamins and minerals would tend to confuse and mislead consumers by giving rise to conflicting claims regarding the beneficial effects of various vitamins and minerals and would be likely to lead to the impression on the part of consumers that a single article of food so enriched would meet all nutritional needs. * * *"

It is still further suggested that the regulations will promote consumer understanding of the relative value of enriched and natural foods.

As is shown by the statutory provision quoted heretofore, the Administrator is authorized to promulgate regulations fixing standards whenever, in his judgment, "such action will promote honesty and fair dealing in the interest of consumers." Thus, his action in the interest of consumers is expressly limited to the promotion of honesty and fair dealing in their behalf.

That the promotion of honesty and fair dealing was intended by Congress to mean something other than the promotion of the consumers' health is plainly ascertainable from a study of the Act. Likewise, it is clear that action was not authorized merely to avoid confusion on the part of consumers, nor to educate the public as to dietary requirements. If Congress had so intended, it would, no doubt, have employed the appropriate language. While there may be some relevancy between the promotion of health and that of honesty and fair dealing, they certainly are not synonymous terms. Injury to health does not necessarily follow from dishonesty and unfair dealing in food products, and neither does health improvement necessarily follow from honesty and fair dealing.

That Congress used the words "honesty and fair dealing" in their ordinary sense, we think there is little room to doubt. The general rule that legislative words must be so construed, is strengthened, so we think, by a reading of the Act which became a law June 25, 1938, entitled "Federal Food, Drug, and Cosmetic Act." It is divided into seven sub-chapters, including sub-chapter 4 relating to food, 21 U.S.C.A. § 341 et seq., the one now under consideration. Under this sub-chapter, Section 341 defines the Administrator's authority for the fixing of standards. In addition to the language quoted heretofore from this section, it contains a clause, as follows: " * * * In prescribing a definition and standard of identity for any food or class of food in which optional ingredients are permitted, the Administrator shall, for the purpose of promoting honesty and fair dealing in the interest of consumers, designate the optional ingredients which shall be named on the label. * * *"

In other words, telling the consumer the truth as to optional ingredients is declared to be in the promotion of honesty and fair dealing. The law makers evidently did not contemplate the dietary requirements of consumers, the likelihood of confusion relative thereto, or their need for education as constituting a basis for the promotion of honesty and fair dealing.

Section 342 is entitled "Adulterated Food" and describes the conditions under which a food shall be deemed to be adulterated. It contains such designations as poisonous or deleterious to health, filthy, putrid, decomposed, substitution and concealment. Section 343 is entitled "Misbranded Food" and Paragraphs (a) to (k), inclusive, describe such foods. Terms are employed such as false or misleading label, offering for sale under another name, imitation of another food, misleading container, and artificial flavoring. Paragraph (g) describes as misbranded a food represented as one for which a standard has been prescribed unless (1) it conforms to such definition and standard, and (2) its label bears the names specified in the standard and, in so far as required by the regulation, the name of any optional in-

gredients. It will thus be observed that the truth as to a food for which a standard has been fixed permits it to escape the indictment of being misbranded.

If defendant's contention be accepted that he has the authority to fix a standard as to the ingredients of a food which is truthfully labeled, then it would seem to follow that the statute indicts as misbranded that which, as a matter of fact, is correctly branded. This is the tortious result achieved by attempting to promote a dietary standard rather than honesty and fair dealing, as the statute requires. The result is all the more obnoxious in the instant situation where, as already pointed out, the consumer is adequately and truthfully informed as to petitioner's product which, in addition, is in no way deleterious to the health of the consumer.

Our discussion, designed to show that a standard food, although in the interest of the consumer, does not meet the test of honesty and fair dealing, is further strengthened by a study of sub-chapter V, 21 U.S.C.A. § 351 et seq., relating to drugs. As noted, this is a part of the same Act and enacted at the same time. While we make no attempt to construe this sub-chapter, a study of it readily discloses that the intention was to prohibit the sale of drugs under false, misleading and deceptive labels. In other words, it was sought to protect the consumer by requiring that he be truthfully informed as to the contents of the drug offered for sale. Illustrative is Section 352(d) which removes habit-forming drugs from the misbranded class where the label correctly bears the name and quantity of the ingredient, with the warning that it may be habit-forming. It seems unreasonable to think that Congress intended to apply the odious term "misbranded" to a food product correctly labeled and admittedly wholesome and beneficial, and permit drugs to escape such designation by the means of a truthful and honest label.

■ The findings and argument predicated upon the possibilities for confusion of consumers, in optional partial enrichment, carry little, if any, weight. There was no evidence in support of such possibilities and they are entirely speculative and conjectural. As was said in Federal Trade Commission v. Raladam Company, 283 U.S. 643, 653, 51 S.Ct. 587, 592, 75 L.Ed. 1324, 79 A.L.R. 1191: "* * * All this was left without proof, and remains, at best, a matter of conjecture. Something more substantial than that is required as a basis for the exercise of the authority of the Commission."

Looking at the realities of the situation, it is difficult to perceive how consumers' confusion, resulting from the truth as to the ingredients of a product, could support an action to promote honesty and fair dealing.

■ Furthermore, we should think that a product manufactured in accordance with the regulations in suit would tend to increase rather than retard confusion. This is especially true as to enriched farina. No such product has been sold heretofore under that designation. The manufacturer will be required only to label it "enriched farina" unless the option to add vitamin D is exercised, in which case such addition must be stated. How the ordinary consumer will be informed so as to avoid confusion as to what is meant by enriched farina, its contents, or the benefits to be expected from its use, is a mystery which we are not able to fathom. How the contention that confusion is likely to result from a product, such as petitioner's, which truthfully informs the consumer as to what he is buying, can be reconciled with the contention that a product sold as enriched farina, without any further description, will lessen or avoid confusion, is beyond our comprehension.

■ Another unreasonable and, we think, arbitrary result of these regulations is that petitioner is precluded from adding vitamin D to its product, as it has done for many years and, at the same time, permitted to add vitamin D as an optional ingredient in enriched farina. We say it is unreasonable for the reason that no claim is made of any relationship or co-action between vitamin D and the other ingredients required in enriched farina. As a result, the consumer who is deficient in vitamin D only, as is often the case, must buy a product containing vitamins and ingredients which he does not need, or does not want, in order to obtain the benefit of vitamin D. Another unreasonable result, so we think, is that by the exclusion of vitamin D from petitioner's product, many people will be deprived of this admittedly essential vitamin. This result is none the less real by reason of the suggestion that milk is the most appropriate carrier of vitamin D, and that the majority of consumers (infants and

children) who use petitioner's product are also large consumers of milk. There might be merit to this suggestion but for the fact that vitamin D is not a substantial ingredient of milk or any other natural food product in ordinary use. Thus, in order to obtain this essential vitamin in milk, it must be added thereto. Looking at the realities of the situation, we think this would mean that very few of the so-called low income group would receive sufficient vitamin D. Too many of them, no doubt, are without the necessary amount of milk, much less milk to which this vitamin has been added. So, as a final result, the regulations are responsible for a situation whereby a consumer is precluded from obtaining vitamin D alone in connection with farina; he may get it in connection with enriched farina at the option of the manufacturer, or he may get it with his milk, provided he possesses the foresight to see that it is added thereto.

Respondent relies strongly upon United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234, wherein the court sustained the validity of an act which prohibited the shipment in interstate commerce of skimmed milk compounded with any fat or oil other than milk fat, so as to resemble milk or cream. We think this case furnishes respondent's position little, if any, support. The court, in commenting upon the Congressional hearings, on page 149 of 304 U.S., page 781 of 58 S.Ct., said: " * * * Both committees concluded, as the statute itself declares, that the use 'of filled milk as a substitute for pure milk is generally injurious to health and facilitates fraud on the public."

And again, on page 151 of 304 U.S., page 783 of 58 S.Ct., it stated: "Here the prohibition of the statute is inoperative unless the product is 'in imitation or semblance of milk, cream, or skimmed milk, whether or not condensed.' * * * "

As these quotations indicate, the court was considering legislation concerning a product which Congress concluded was injurious to health and a fraud upon the public. It was pointed out that the inferior product was indistinguishable from pure milk "thus making fraudulent dis-

tribution easy and protection of the consumer difficult." In the instant situation, however, there is nothing about the appearance of the product facilitating fraud upon the consumer. True, as the record discloses, plain farina, petitioner's farina and enriched farina are indistinguishable in appearance and taste. Petitioner's product, however, is in no sense a substitution, an imitation, or injurious to health. Therefore, if the condemning language of the Carolene case is applicable to petitioner's product, which we think it is not, it is also applicable to plain farina and enriched farina. So far as appearance and taste are concerned, there is no more likelihood of the consumer being deceived or confused as to petitioner's product than as to either of the others. Furthermore, the court in the Carolene case was dealing with the power of Congress, while here we are considering the authority which Congress has conferred upon the Administrator, and the reasonableness of his action.

Hebe Company v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255, is also relied upon by respondent. This case was cited and relied upon in the Carolene case, 304 U.S. page 148, 58 S.Ct. page 781, 82 L. Ed. 1234, and, we think, is likewise distinguishable. The element of fraudulent substitution was present in both cases.

We have not overlooked respondent's argument that courts will not substitute their judgment for that of an Administrative Agency on the wisdom or expediency of a determination within its jurisdiction. There is no occasion to cite or comment upon cases cited in support of this argument. We do not take issue—in fact, we agree. The rule, however, is of no benefit to respondent in the instant situation because, as we have endeavored to show, the regulations, while purporting to be in the interest of consumers, do not promote honesty and fair dealing in their behalf. On this statutory requirement, essential to respondent's authority to act, the record is wholly deficient. In view of this situation, the action of respondent, in promulgating the regulations in controversy, was beyond his statutory authority. Such being the case, they must be set aside. It is so ordered.