## FEDERAL SECURITY ADMINISTRATOR *v.* QUAKER OATS CO.

No. 424.  Argued February 4, 5, 1943.—Decided March 1, 1943.

*Mr. Valentine Brookes* argued the cause, and *Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Louis B. Schwartz, Irwin L. Langbein, Richard S. Salant, Jack B. Tate,* and *Patrick D. Cronin* were on the brief, for petitioner.

*Mr. George I. Haight,* with whom *Mr. William D. Mc-Kenzie* was on the brief, for respondent.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

The Federal Security Administrator, acting under §§ 401 and 701 (e), of the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, 1046, 1055 (21 U. S. C. §§ 341, 371), promulgated regulations establishing "standards of identity" for various milled wheat products, excluding vitamin D from the defined standard of "farina" and permitting it only in "enriched farina," which was required to contain vitamin $B_1$, riboflavin, nicotinic acid and iron. The question is whether the regulations are valid as applied to respondent. The answer turns upon (a) whether there is substantial evidence in support of the Administrator's finding that indiscriminate enrichment of farina with vitamin and mineral contents would tend to confuse and mislead consumers; (b) if so, whether, upon such a finding, the Administrator has statutory authority to adopt a standard of identity, which excludes a disclosed non-deleterious ingredient, in order to promote honesty and fair dealing in the interest of consumers; and (c) whether the

Administrator's treatment, by the challenged regulations, of the use of vitamin D as an ingredient of a product sold as "farina" is within his statutory authority to prescribe "a reasonable definition and standard of identity."

Section 401 of the Act provides that "Whenever in the judgment of the Administrator such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity . . . In prescribing a definition and standard of identity for any food or class of food in which optional ingredients are permitted, the Administrator shall, for the purpose of promoting honesty and fair dealing in the interest of consumers, designate the optional ingredients which shall be named on the label." By § 701 (e) the Administrator, on his own initiative or upon application of any interested industry or a substantial part of it, is required to "hold a public hearing upon a proposal to issue, amend, or repeal any regulation contemplated by" § 401. At the hearing "any interested person may be heard." The Administrator is required to promulgate by order any regulation he may issue to "base his order only on substantial evidence of record at the hearing," and to "set forth as part of his order detailed findings of fact on which the order is based." [1]

Any food which "purports to be or is represented as a food for which a definition and standard of identity has been prescribed" pursuant to § 401 is declared by § 403 (g)

---

[1] As enacted, the Act vested the foregoing powers in the Secretary of Agriculture. By §§ 12 and 13 of Reorganization Plan No. IV, 54 Stat. 1234, 1237, approved April 11, 1940, the Federal Food and Drug Administration and all functions of the Secretary of Agriculture relating thereto were transferred to the Federal Security Agency and the Federal Security Administrator.

to be misbranded "unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients . . . present in such food." The shipment in interstate commerce of "misbranded" food is made a penal offense by §§ 301 and 303. "In a case of actual controversy as to the validity" of an order issuing regulations under § 401 any person "adversely affected" by it may secure its review on appeal to the Circuit Court of Appeals for the circuit of his residence or principal place of business. On such review the findings of the Administrator "as to the facts, if supported by substantial evidence, shall be conclusive." § 701 (f) (1), (f) (3).

After due notice [2] and a hearing in which respondent participated, the Administrator by order promulgated regulations establishing definitions and standards of identity for sixteen milled wheat products, including "farina" and "enriched farina." Regulation 15.130 defined "farina" as a food prepared by grinding and bolting cleaned wheat, other than certain specified kinds, to a prescribed fineness with the bran coat and germ of the wheat berry removed to a prescribed extent. The regulation made no provision for the addition of any ingredients to "farina." Regulation 15.140 defined "enriched farina" as conforming to the regulation defining "farina," but with added prescribed minimum quantities of vitamin

---

[2] Respondent contended in the court below that the notice was inadequate. It appears to have abandoned that contention here, but in any event we think that it is without merit in view of respondent's participation in the original hearing, and in view of the publication of notice of a reconvened hearing devoted solely to the "propriety of the addition of vitamins and minerals to . . . (I) farina . . ."

$B_1$, riboflavin,[3] nicotinic acid (or nicotinic acid amide) and iron. The regulation also provided that minimum quantities of vitamin D, calcium, wheat germ or disodium phosphate might be added as optional ingredients of "enriched farina," and required that ingredients so added be specified on the label. In support of the regulations the Administrator found that "unless a standard" for milled wheat products "is promulgated which limits the kinds and amounts of enrichment, the manufacturers' selection of the various nutritive elements and combinations of elements on the basis of economic and merchandising considerations is likely to lead to a great increase in the diversity, both qualitative and quantitative, in enriched flours offered to the public. Such diversity would tend to confuse and mislead consumers as to the relative value of and need for the several nutritional elements, and would impede rather than promote honesty and fair dealing in the interest of consumers."

On respondent's appeal from this order the Court of Appeals for the Seventh Circuit set it aside, 129 F. 2d 76, holding that the regulations did not conform to the statutory standards of reasonableness, that the Administrator's findings as to probable consumer confusion in the absence of the prescribed standards of identity were without support in the evidence and were "entirely speculative and conjectural," and that in any case such a finding would not justify the conclusion that the regulations would "promote honesty and fair dealing in the interest of consumers." We granted certiorari, 317 U. S. 616, because of the importance of the questions involved to the administration of the Food, Drug and Cosmetic Act.

---

[3] The effective date of the riboflavin requirement has been postponed until April 20, 1943, because it appeared that the available supply was inadequate. 7 Fed. Reg. 3055.

Respondent, The Quaker Oats Company, has for the past ten years manufactured and marketed a wheat product commonly used as a cereal food, consisting of farina as defined by the Administrator's regulation, but with vitamin D added. Respondent distributes this product in packages labeled "Quaker Farina Wheat Cereal Enriched with Vitamin D," or "Quaker Farina Enriched by the Sunshine Vitamin." The packages also bear the label "Contents 400 U. S. P. units of Vitamin D per ounce, supplied by approximately the addition of $\frac{1}{5}$ of 1 percent irradiated dry yeast."

Respondent asserts, and the Government agrees, that the Act as supplemented by the Administrator's standards will prevent the marketing of its product as "farina" since, by reason of the presence of vitamin D as an ingredient, it does not conform to the standard of identity prescribed for "farina," and that respondent cannot market its product as "enriched farina" unless it adds the prescribed minimum quantities of vitamin $B_1$, riboflavin, nicotinic acid and iron. Respondent challenges the validity of the regulations on the grounds sustained below and others so closely related to them as not to require separate consideration.

As appears from the evidence and the findings, the products of milled wheat are among the principal items of the American diet, particularly among low income groups.[4] Farina, which is a highly refined wheat product resembling flour but with larger particles, is used in macaroni, as a breakfast food, and extensively as a cereal food for children. It is in many cases the only cereal consumed by them during a period of their growth. Both farina and flour are manufactured by grinding the whole wheat and discarding its bran coat and germ. This process

---

[4] One witness at the hearing referred to estimates that over 95% of human consumption of wheat products is in the form of white flour.

removes from the milled product that part of the wheat which is richest in vitamins and minerals, particularly vitamin $B_1$, riboflavin, nicotinic acid and iron, valuable food elements which are often lacking in the diet of low income groups. In their diet, especially in the case of children, there is also frequently a deficiency of calcium and vitamin D, which are elements not present in wheat in significant quantities. Vitamin D, whose chief dietary value is as an aid to the metabolism of calcium, is developed in the body by exposure to sunlight. It is derived principally from cod liver and other fish oils. Milk is the most satisfactory source of calcium in digestible form, and milk enriched by vitamin D is now on the market.

In recent years millers of wheat have placed on the market flours and farinas which have been enriched by the addition of various vitamins and minerals. The composition of these enriched products varies widely.[5] There was testimony of weight before the Administrator, prin-

---

[5] The report of the officer presiding at the hearing enumerates the following varieties disclosed by the testimony:

"Flours, phosphated flours, and self-rising flours—

1. One with added vitamin D;
2. One with added calcium;
3. One with added vitamin $B_1$, nicotinic acid, and calcium [produced by some 23 mills];
4. One with added vitamin $B_1$, calcium, and iron;
5. One containing wheat germ and wheat germ oil, said to furnish vitamin $B_1$, vitamin E and riboflavin;
6. One 'long extraction' flour containing $B_1$, riboflavin, calcium and iron."

"Farinas—

7. One with added vitamin D;
8. One with added vitamin $B_1$, calcium and iron."

The labels used, and advertising claims made, for those products were not in the record. However, there was testimony that certain of them were sold under such names as "Sunfed," "Vitawhite," "Holwhite."

cipally by expert nutritionists, that such products, because of the variety and combination of added ingredients, are widely variable in nutritional value; and that consumers generally lack knowledge of the relative value of such ingredients and combinations of them.

These witnesses also testified, as did representatives of consumer organizations which had made special studies of the problems of food standardization, that the number, variety and varying combinations of the added ingredients tend to confuse the large number of consumers who desire to purchase vitamin-enriched wheat food products but who lack the knowledge essential to discriminating purchase of them; that because of this lack of knowledge and discrimination they are subject to exploitation by the sale of foods described as "enriched," but of whose inferior or unsuitable quality they are not informed. Accordingly a large number of witnesses recommended the adoption of definitions and standards for "enriched" wheat products which would ensure fairly complete satisfaction of dietary needs, and a somewhat lesser number recommended the disallowance, as optional ingredients in the standards for unenriched wheat products, of individual vitamins and minerals whose addition would suggest to consumers an adequacy for dietary needs not in fact supplied.

The court below characterized this evidence as speculative and conjectural, and held that because there was no evidence that respondent's product had in fact confused or misled anyone, the Administrator's finding as to consumer confusion was without substantial support in the evidence. It thought that, if anything, consumer confusion was more likely to be created, and the interest of consumers harmed, by the sale of farinas conforming to the standard for "enriched farina," whose labels were not required to disclose their ingredients, than by the sale of respondent's product under an accurate and informative label such as that respondent was using.

The Act does not contemplate that courts should thus substitute their own judgment for that of the Administrator. As passed by the House it appears to have provided for a judicial review in which the court could take additional evidence, weigh the evidence, and direct the Administrator "to take such further action as justice may require." H. R. Rep. No. 2139, 75th Cong., 3d Sess., pp. 11–12. But before enactment, the Conference Committee substituted for these provisions those which became § 701 (f) of the Act. While under that section the Administrator's regulations must be supported by findings based upon "substantial evidence" adduced at the hearing, the Administrator's findings as to the facts if based on substantial evidence are conclusive. In explaining these changes the chairman of the House conferees stated on the floor of the House that "there is no purpose that the court shall exercise the functions that belong to the executive or the legislative branches." 83 Cong. Rec., p. 9096. See also H. R. Rep. No. 2716, 75th Cong., 3d Sess., p. 25. Compare *Federal Radio Comm'n* v. *General Electric Co.*, 281 U. S. 464.

The review provisions were patterned after those by which Congress has provided for the review of "quasi-judicial" orders of the Federal Trade Commission and other agencies, which we have many times had occasion to construe.[6] Under such provisions we have repeatedly emphasized the scope that must be allowed to the discre-

---

[6] The provision adopted by the Conference Committee is one which was proposed as an amendment from the floor of the House by Mr. Mapes, a minority member of the House Committee and one of the House conferees. In proposing it he said that it was "the same as the court review section in the Federal Trade Commission Act with only such changes as are necessary to adapt it to the pending bill," and he referred to "similar" provisions in the Bituminous Coal Commission Act, National Labor Relations Act, Securities Exchange Act, and Federal Communications Act. 83 Cong. Rec., 7892, 7777–8.

tion and informed judgment of an expert administrative body. *Federal Trade Comm'n* v. *Education Society,* 302 U. S. 112, 117; *Gray* v. *Powell,* 314 U. S. 402, 412; *Labor Board* v. *Link Belt Co.,* 311 U. S. 584, 597; see *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 141, 144. These considerations are especially appropriate where the review is of regulations of general application adopted by an administrative agency under its rule-making power in carrying out the policy of a statute with whose enforcement it is charged. Compare *Houston* v. *St. Louis Independent Packing Co.,* 249 U. S. 479, 487; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 156. Section 401 calls for the exercise of the "judgment of the Administrator." That judgment, if based on substantial evidence of record, and if within statutory and constitutional limitations, is controlling even though the reviewing court might on the same record have arrived at a different conclusion.

None of the testimony which we have detailed can be said to be speculative or conjectural unless it be the conclusion of numerous witnesses, adopted by the Administrator, that the labeling and marketing of vitamin-enriched foods, not conforming to any standards of identity, tend to confuse and mislead consumers. The exercise of the administrative rule-making power necessarily looks to the future. The statute requires the Administrator to adopt standards of identity which in his judgment "will" promote honesty and fair dealing in the interest of consumers. Acting within his statutory authority he is required to establish standards which will guard against the probable future effects of present trends. Taking into account the evidence of public demand for vitamin-enriched foods, their increasing sale, their variable vitamin composition and dietary value, and the general lack of consumer knowledge of such values, there was sufficient evidence of

"rational probative force" (see *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 229, 230), to support the Administrator's judgment that, in the absence of appropriate standards of identity, consumer confusion would ensue. *Federal Trade Comm'n* v. *Raladam Co.,* 283 U. S. 643, 651; *Federal Trade Comm'n* v. *Raladam Co.,* 316 U. S. 149, 151, 152; *Pacific States Box Co.* v. *White,* 296 U. S. 176, 181. Compare *McLean* v. *Fleming,* 96 U. S. 245, 251, 253-4, 255.

Respondent insists, as the court below held, that the consumer confusion found by the Administrator affords no basis for his conclusion that the standards of identity adopted by the Administrator will promote honesty and fair dealing. But this is tantamount to saying, despite the Administrator's findings to the contrary, either that in the circumstances of this case there could be no such consumer confusion or that the confusion could not be deemed to facilitate unfair dealing contrary to the interest of consumers. For reasons already indicated we think that the evidence of the desire of consumers to purchase vitamin-enriched foods, their general ignorance of the composition and value of the vitamin content of those foods, and their consequent inability to guard against the purchase of products of inferior or unsuitable vitamin content, sufficiently supports the Administrator's conclusions.

We have recognized that purchasers under such conditions are peculiarly susceptible to dishonest and unfair marketing practices. In *United States* v. *Carolene Products Co.,* 304 U. S. 144, 149, 150, we upheld the constitutionality of a statute prohibiting the sale of "filled milk"—a condensed milk product from which the vitamin content had been extracted—although honestly labeled and not in itself deleterious. Decision was rested on the ground that Congress could reasonably conclude

that the use of the product as a milk substitute deprives consumers of vitamins requisite for health and "facilitates fraud on the public" by "making fraudulent distribution easy and protection of the consumer difficult."

Both the text and legislative history of the present statute plainly show that its purpose was not confined to a requirement of truthful and informative labeling. False and misleading labeling had been prohibited by the Pure Food and Drug Act of 1906. But it was found that such a prohibition was inadequate to protect the consumer from "economic adulteration," by which less expensive ingredients were substituted, or the proportion of more expensive ingredients diminished, so as to make the product, although not in itself deleterious, inferior to that which the consumer expected to receive when purchasing a product with the name under which it was sold. Sen. Rep. No. 493, 73d Cong., 2d Sess., p. 10; Sen. Rep. No. 361, 74th Cong., 1st Sess., p. 10. The remedy chosen was not a requirement of informative labeling. Rather it was the purpose to authorize the Administrator to promulgate definitions and standards of identity "under which the integrity of food products can be effectively maintained" (H. R. Rep. 2139, 75th Cong., 3d Sess., p. 2; H. R. Rep. 2755, 74th Cong., 2d Sess., p. 4), and to require informative labeling only where no such standard had been promulgated, where the food did not purport to comply with a standard, or where the regulations permitted optional ingredients and required their mention on the label. §§ 403 (g), 403 (i); see Sen. Rep. No. 361, 74th Cong., 1st Sess., p. 12; Sen. Rep. No. 493, 73d Cong., 2d Sess., pp. 11–12.

The provisions for standards of identity thus reflect a recognition by Congress of the inability of consumers in some cases to determine, solely on the basis of informative labeling, the relative merits of a variety of products

superficially resembling each other.[7] We cannot say that such a standard of identity, designed to eliminate a source of confusion to purchasers—which otherwise would be likely to facilitate unfair dealing and make protection of the consumer difficult—will not "promote honesty and fair dealing" within the meaning of the statute.

Respondent's final and most vigorous attack on the regulations is that they fail to establish reasonable definitions and standards of identity, as § 401 requires, in that they prohibit the marketing, under the name "farina," of a wholesome and honestly labeled product consisting of farina with vitamin D added, and that they prevent the addition of vitamin D to products marketed as "enriched farina" unless accompanied by the other prescribed vitamin ingredients which do not co-act with or have any dietary relationship to vitamin D. Stated in another form, the argument is that it is unreasonable to prohibit the addition to farina of vitamin D as an optional ingredient while permitting its addition as an optional ingredient to enriched farina, to the detriment of respondent's business.

---

[7] A Message of the President, dated March 22, 1935, urging passage of the bill and particularly of the standard of identity provision, pointed out that "The various qualities of goods require a kind of discrimination which is not at the command of consumers. They are likely to confuse outward appearances with inward integrity. In such a situation as has grown up through our rising level of living and our multiplication of goods, consumers are prevented from choosing intelligently and producers are handicapped in any attempt to maintain higher standards." H. R. Rep. No. 2755, 74th Cong., 2d Sess., pp. 1–2.

The Chairman of the Food and Drug Administration testified before the Senate Committee that the provision for standards of identity which would reflect "the expectation of the buyer" was "one of the most important provisions of the Act." Hearings before a Subcommittee of the Senate Committee on Commerce on S. 1944, Dec. 7 and 8, 1933, pp. 35, 36.

The standards of reasonableness to which the Administrator's action must conform are to be found in the terms of the Act construed and applied in the light of its purpose. Its declared purpose is the administrative promulgation of standards of both identity and quality in the interest of consumers. Those standards are to be prescribed and applied, so far as is practicable, to food under its common or usual name, and the regulations adopted after a hearing must have the support of substantial evidence. We must reject at the outset the argument earnestly pressed upon us that the statute does not contemplate a regulation excluding a wholesome and beneficial ingredient from the definition and standard of identity of a food. The statutory purpose to fix a definition of identity of an article of food sold under its common or usual name would be defeated if producers were free to add ingredients, however wholesome, which are not within the definition. As we have seen, the legislative history of the statute manifests the purpose of Congress to substitute, for informative labeling, standards of identity of a food, sold under a common or usual name, so as to give to consumers who purchase it under that name assurance that they will get what they may reasonably expect to receive. In many instances, like the present, that purpose could be achieved only if the definition of identity specified the number, names and proportions of ingredients, however wholesome other combinations might be. The statute accomplished that purpose by authorizing the Administrator to adopt a definition of identity by prescribing some ingredients, including some which are optional, and excluding others, and by requiring the designation on the label of the optional ingredients permitted.[8]

---

[8] The standard of identity provision was repeatedly stated in the Committee reports to have been patterned on the Butter Standards Act of 1923, 42 Stat. 1500. Sen. Rep. No. 361, 74th Cong., 1st Sess.,

Since the definition of identity of a vitamin-treated food, marketed under its common or usual name, involves the inclusion of some vitamin ingredients and the exclusion of others, the Administrator necessarily has a large range of choice in determining what may be included and what excluded. It is not necessarily a valid objection to his choice that another could reasonably have been made. The judicial is not to be substituted for the legislative judgment. It is enough that the Administrator has acted within the statutory bounds of his authority, and that his choice among possible alternative standards adapted to the statutory end is one which a rational person could have made. *Houston* v. *St. Louis Independent Packing Co., supra,* 487.

The evidence discloses that it is well known that the milling process for producing flours and farinas removes

---

p. 10; Sen. Rep. No. 646, 74th Cong., 1st Sess., p. 4; Sen. Rep. No. 493, 73d Cong., 2nd Sess., p. 10; H. R. Rep. No. 2139, 75th Cong., 3rd Sess., p. 5. That Act was entitled "An Act to define butter and provide a standard therefor," and establish a legislative definition and standard for butter. The Chairman of the House Committee which reported it said "The only things you can put into [butter] are salt, casein, the butter fat, and water. That is what the definition provides." Hearings, House Committee on Agriculture on H. R. 12053, 67th Cong., 2nd Sess., p. 25; see also H. R. Rep. No. 1141, 67th Cong., 2nd Sess., p. 4.

Also referred to as models for the standards to be promulgated under the present act were the advisory standards then being promulgated by the Pure Food and Drug Administration under the authority given by the Appropriation Act of June 3, 1902, 32 Stat. 286, 296, and subsequent acts. Hearing before a Subcommittee of the Senate Committee on Commerce on S. 1944, Dec. 7 and 8, 1933, p. 36. (Statement of Walter B. Campbell, Chief of Food and Drug Administration, Dept. of Agriculture.) The announcements promulgating these standards stated that they were "so framed as to exclude substances not mentioned in the definition." E. g., Dept. of Agriculture, Food and Drug Administration, Service and Regulatory Announcement No. 2, Revision 4 (1933) p. 1; *id.*, Rev. 5 (1936) p. 1.

from the wheat a substantial part of its health-giving vitamin contents, which are concededly essential to the maintenance of health, and that many consumers desire to purchase wheat products which have been enriched by the restoration of some of the original vitamin content of the wheat. In fixing definitions and standards of identity in conformity with the statutory purpose the Administrator was thus confronted with two related problems. One was the choice of a standard which would appropriately identify unenriched wheat products which had long been on the market. The other was the selection of a standard for enriched wheat products which would both assure to consumers of vitamin-enriched products some of the benefits to health which they sought, and protect them from exploitation through the marketing of vitamin-enriched foods of whose dietary value they were ignorant. In finding the solution the Administrator could take into account the facts that whole wheat is a natural and common source of the valuable dietary ingredients which he prescribed for enriched farina; that wheat is not a source of vitamin D; that milk, a common article of diet, is a satisfactory source of an assimilable form of calcium; that the principal function of vitamin D is to aid in the metabolism of calcium; and that milk enriched with vitamin D was already on the market.

We cannot say that the Administrator made an unreasonable choice of standards when he adopted one which defined the familiar farina of commerce without permitting addition of vitamin enrichment, and at the same time prescribed for "enriched farina" the restoration of those vitamins which had been removed from the whole wheat by milling, and allowed the optional addition of vitamin D, commonly found in milk but not present in wheat. Consumers who buy farina will have no reason to believe that it is enriched. Those who buy enriched farina are assured of receiving a wheat product containing those vitamins

naturally present in wheat, and, if so stated on the label, an additional vitamin D, not found in wheat.

Respondent speaks of the high cost of vitamin B₁ ($700 per pound), but there was evidence that the cost of adding to flour the minute quantities of the four ingredients required for enriched farina would be about 75 cents per barrel, and respondent concedes that the cost to it may be but a fraction of a cent per pound. The record is otherwise silent as to the probable effect of the increased cost on the marketing of respondent's product. On this record it does not appear that the increased cost has any substantial bearing on the reasonableness of the regulation.

We conclude that the Administrator did not depart from statutory requirements in choosing these standards of identity for the purpose of promoting fair dealing in the interest of consumers, that the standards which he selected are adapted to that end, and that they are adequately supported by findings and evidence.

*Reversed.*

Mr. Justice Murphy and Mr. Justice Rutledge took no part in the consideration or decision of this case.

Mr. Justice Roberts is of opinion that the judgment should be affirmed for the reasons stated by the Circuit Court of Appeals, 129 F. 2d 76.