**STERLING DAVIS DAIRY, Plaintiff,**

v.

**Orville L. FREEMAN, Secretary of Agriculture of the United States of America, Defendant.**

**Civ. No. 625–64.**

United States District Court
D. New Jersey.

Oct. 7, 1965.

Parker, McCay & Criscuolo (Robert W. Criscuolo, Mount Holly, N. J., Daniels, Swope & Snyder, Harold W. Swope, Harrisburg, Pa.), for plaintiff.

David M. Satz, Jr., U. S. Atty., Mark E. Litowitz, Asst. U. S. Atty., Trenton, N. J., John G. Liebert, Atty., Dept. of Agriculture, Washington, D. C., for defendant.

LANE, District Judge:

This matter comes before the court by way of its review jurisdiction pursuant to 7 U.S.C. § 608c(15) (B) of the Agriculture Marketing Agreement Act of 1937.[1] Both plaintiff and defendant, United States Secretary of Agriculture, seek summary judgment on the facts appearing in the administrative record. Wawa Dairy Farms v. Wickard, 56 F. Supp. 67 (E.D.Pa.1944), aff'd 149 F.2d 860 (3d Cir. 1945); Windham Creamery,

1. 7 U.S.C. §§ 601 et seq., as amended.

Inc. v. Freeman, 230 F.Supp. 632 (D.C. N.J.1964).

It is plaintiff's contention that certain actions by the Secretary and his agents—particularly the Market Administrator for the New York-New Jersey area—have not been in accordance with the law of the governing milk order.[2] More specifically, Sterling Davis Dairy alleges (1) that the Market Administrator erroneously determined plaintiff's milk operation to be one of "pool plant" status during the August 1957 through March 1958 period in issue; (2) that certain assessments representing skim milk differential payments imposed on plaintiff by the Market Administrator for the months including April 1958 through December 1960 are contrary to recent Supreme Court interpretation of the 1937 Act; and (3) that the same Supreme Court interpretation requires a rebate from the Producers Settlement Fund for certain now invalid compensatory payments made during June 1958.

Previous to this action, these several determinations were upheld by both the Hearing Examiner and the Judicial Officer in Department of Agriculture administrative appeals proceedings conducted pursuant to 7 U.S.C. § 608c(15) (A).[3]

In defining the scope of judicial review, section 10(e) of the federal Administrative Procedure Act states that "the court shall review the whole record or such portions thereof as may be cited by any party."[4] The Supreme Court in Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), considered the above-cited section at great length. There, Justice Frankfurter affirmed the duty of the reviewing tribunal to take into account the entire administrative record, including that evidence which "fairly detracts from" or contradicts the agency decision. Id. at 488, 71 S.Ct. 456.

It is not the function of the court, however, to engage in a *de novo* fact-finding or trial process. Rather, such review is limited to ascertaining whether on the whole record the agency decision is established by substantial evidence, and is not contrary to law. Federal Security Adm'r v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724 (1943).

Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. National Labor Relations Bd., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Once such a basis is found—again, in light of all of the record proofs—the court can not exercise an independent judgment so as to overrule or modify the decision of a Congressionally empowered administrator. Wawa Dairy Farms v. Wickard, supra; C. J. Weiland & Son Dairy Products Co. v. Wickard, 68 F.Supp. 93 (E.D.Wisc.1946); Windham Creamery, Inc. v. Freeman, supra.

Agency actions "contrary to law" typically involve fundamental issues of constitutional powers, statutory authority and interpretation, and specific constitutionality as regards various procedural aspects of due process. See Rochester Tel. Corp. v. United States, 307 U.S. 125, 139–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). It is to be noted that the "substantial evidence" test itself is closely related to the due process concept. An administrative ruling not reasonably supported by the proofs is, hence, violative of due process because of its inherently arbitrary character. This relationship is of particular significance to the instant controversy, for here plaintiff's contention that its pool plant denomination is not "in accordance with law," rests on

---

**2.** Prior to January 1, 1962, the New York-New Jersey Milk Marketing Order was designated as Order No. 27, and was found at 7 C.F.R. §§ 927 et seq. Following general reorganization, the citation became Order No. 2, 7 C.F.R. §§ 1002 et seq.

The present denomination will be used throughout this opinion.

**3.** In re Sterling Davis Dairy, Petitioner, AMA Docket No. 27–135 (1964).

**4.** 5 U.S.C. § 1009(e).

the alleged failure of the evidence to so sufficiently demonstrate.

█ The concept of "burden of proof" offers a final guideline in court review of administrative rulings. Regarding this, it is well established that the onus of showing arbitrary and capricious, or otherwise illegal agency activity, is borne by the challenging party. See Wawa Dairy Farms, Inc. v. Wickard, 56 F.Supp. 67, 70, supra; Windham Creamery, Inc. v. Freeman, supra.

█ Moreover, the burden of establishing the classification of milk handled is statutorily imposed upon plaintiff, as an acknowledged milk handler under the Act. Should any handler fail to demonstrate otherwise, all milk is classified as Class I-A, and all skim milk in Class II and Class III is subject to the fluid skim differential. 7 C.F.R. § 1002.31. For purposes of administering the Act, each handler is required to submit monthly reports to the Market Administrator revealing the amount, type, source, and disposition of milk received at his particular plants. 7 C.F.R. § 1002.50. To the end of verifying these reports, handlers must make available to the Market Administrator, during the usual hours of business, all relevant records and accounts. 7 C.F.R. § 1002.54.

We now turn to plaintiff's argument. Central to Sterling Davis's initial allegation is the proper effectuation of 7 C.F.R. § 1002.28(a) in light of the facts as revealed by the record. That section, formerly cited at 7 C.F.R. § 927.29(a), defines "temporary pool plants" within the New York-New Jersey milk marketing area. It pertinently reads as follows:

"For any of the months of January through March and July through December, any plant at which 25 per cent or more of the receipts of milk from dairy farmers and units is classified in Class I-A on some basis other than the failure to account for such milk shall automatically be designated a pool plant for such month. * * *"

In the judgment of the Market Administrator, such test was so met by plaintiff's operation for the months of August, 1957 through March 1958. As a result, the dairy became indebted to the Producer Settlement Fund in the amount of some $24,518.00, plus $602.04 to cover incidental assessment for administration.

Plaintiff attacks this determination on dual grounds: The first, dealing with the computation of milk receipts from dairy farmers during the contested period; and the second, regarding Class I-A sales of fluid milk in the New York-New Jersey marketing area. In its argument, plaintiff stresses not the unreasonableness of the Market Administrator's decision in the context of the information available during audit, but rather what it avers are the true facts based on new evidence adduced during the administrative hearing. Since the above-cited pool plant test relies solely on the initial factual determination, Sterling Davis reasons the pool plant finding to be "not in accordance with law" on the entire record.

Not so. The issue joined is one of fact; but it is an issue and a problem of plaintiff's own making. It was only upon court order in 1960 that Sterling Davis supplied the Market Administrator with the records upon which the latter made the now-contested pool plant determination.[5] Plaintiff's present attack consists in the main of clarifying admitted deficiencies, ambiguities and mistakes in those records. It furthermore relies heavily on oral explanation of generally inconclusive documentation. This state of affairs can only work to plaintiff's disadvantage.

To show greater receipts from dairy farmers, Sterling Davis explained that its reports in some instances failed to distinguish between milk from other plants and milk from dairy farmers. Purportedly due to a confusion with the required New Jersey Office of Milk Industry reports, plaintiff excluded certain surplus

5. United States v. Sterling Davis Dairy, Civil Action 164–59, filed June 5, 1959,

United States District Court for the District of New Jersey.

shipments received directly from farmers in certain shipments originally allocated to other area plants but subsequently diverted to Sterling Davis because of their surplus nature. To substantiate these greater receipts, plaintiff produced one of its officers and two of the owners of plants whose surpluses were allegedly transported directly from the farmers to Sterling Davis.

A similar lack of verifiable accounts characterizes plaintiff's argument that certain of its "R. Worrell Route" and "No. 14 Route" sales were outside the milk marketing area. Regarding the Worrell Route, the record indicates that during the 1960 audit neither Worrell nor Sterling Davis provided route books or related business documents which would enable accurate calculation of in-area and out-area sales for the months in question. Plaintiff's new and qualifying proofs during the hearing took the form of Worrell's testimony regarding the geographical dimensions of his route, and admission into evidence of sales estimates based upon his own books and records.

In the case of Route No. 14, plaintiff alleges that there was sufficient information in its daily sales records to which the Market Administrator had access for specific analysis of in-area and out-area sales. According to plaintiff, also, its vice president verbally apprised the Market Administrator's auditor of the meaning of these records. This contention is substantially challenged by the auditor in his statement before the Hearing Examiner. He testified that at no time were complete route books furnished, nor were other records provided adequate to show the ultimate disposition of milk to Route No. 14 customers.

Regarding plaintiff's hearing exhibits which deal with Route No. 14, these records neither locate nor identify the individual customers who were receiving the various milk products. Customer identification on the basis of price charged, although suggested by plaintiff, was deemed unreliable by the testifying government auditor in that similar prices could be assessed to unidentified buyers existing both within and without the market area.

Finally, concerning the Route No. 14 proofs, the record discloses testimony by the auditor that certain handwritten notations on plaintiff's above exhibits—in the form of total sales to specific customers—were not there at the time of audit.

As seen from the earlier-stated law, it is incumbent upon this court to consider all of these proofs. Plaintiff contends, however, that the Hearing Examiner and Judicial Officer erred in their complete rejection of the new evidence and arguments presented at the hearing. Indeed, it is clear from the administrative opinions that the deciding officials did interpret their review as more restricted than that of the court. Thus, quoting In re M. H. Renken Dairy Co., 11 A.D. 264, 272 (1952), the Judicial Officer observes:

"* * * [I]t is apparent that the solution should be sought on the basis of the situation presented to the market administrator rather than on the basis of facts adduced for the first time in this proceeding."

The court does not now attempt to resolve the particular legal question of intra-agency review. Suffice it to say for the present that all evidence was both heard on the record and referred to by the Examiner and the Judicial Officer in their respective rulings. In each decision the lack of adequate documentation upon which the testimony could be verified was a subject of repeated emphasis. In the opinion of the Judicial Officer:

"* * * [E]ven if we consider this a completely *de novo* proceeding, the new evidence submitted would not sustain the burden upon the petitioner in this proceeding. See, e. g., Bailey Farm Dairy Co. v. Jones, 61 F.Supp. 209 (E.D.Mo.1945), aff'd 157 F.2d 87 (8th Cir. 1946), cert. denied, 329 U.S. 788 (1946); Wawa Dairy Farms, Inc. v. Wickard, 56 F.Supp. 67 (E.D.Pa. 1944), aff'd 149 F.2d 860 (3d Cir. 1945). No additional *documentary* evidence with respect to milk receipt and utilization, that is, additional to rec-

ords submitted to the auditor, was submitted; and, in fact, it is clear from the testimony adduced at the hearing that petitioner did not maintain additional pertinent records. In addition, petition's reports, prepared by experienced milk accountants and signed by petitioner's vice-president and general manager, are so contradictory to petitioner's present position and the oral testimony of petitioner's vice-president and general manager that little credence can be now placed upon such testimony. Moreover, the auditor's testimony contradicts that of petitioner's vice-president with respect to the presence of a producer number in connection with handlers listed on petitioner's ledgers and the presence, at the time of the audit, of handwritten notations on the bottom of National Cash Register forms for the last day of each of the months involved. Further, the testimony of Worrell can be characterized at least in part as general, speculative and inexact in nature and not the "stuff upon which milk accounting is based." It must be remembered, too, that Worrell was not even listed on petitioner's reports as an outlet for petitioner's milk."

 Reviewing the entire record, the court finds this a sound and substantial disposition, and one in which it must concur.

The court considers now the issue of skim-milk differential payments. Regarding these payments, here amounting to some $1,311.11, 7 C.F.R. § 1002.43 in pertinent part provides the following:

"The handler shall pay a fluid skim differential per hundredweight for skim milk, other than that derived from Class I–A or Class I–B milk * * *. Such fluid skim differential shall be computed as follows: deduct the price of Class II milk computed pursuant to § 1002.40(d) from the price for Class I–A milk computed pursuant to § 1002.40(a), and divide by 0.9125 * * *."

It is Sterling Davis's contention that the above scheme has been voided by the Supreme Court ruling and decision in Lehigh Valley Co-op. Farmers, Inc. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962). We disagree with this reading.

In Lehigh, the Supreme Court had before it and particularly construed § 927.83 of the former New York-New Jersey milk order. That section generally provided for a plan of "special monetary exactions on handlers introducing 'outside' milk for fluid consumption into a marketing area in months when there is a substantial surplus of milk on the market." Lehigh at 82, 82 S.Ct. at 1172. Under the plan, the affected handlers were required to pay into the Producer Settlement Fund an amount equivalent to the difference between the minimum prices for the highest and for the lowest milk use classification in the New York-New Jersey area. Thus, for each hundredweight of non-pool milk sold for Class I use, a payment equal to the difference between Class I and Class III prices had to be made to the Fund. Id. at 83, 82 S.Ct. 1168. Through this measure, the Secretary attempted to effect competitive parity among both non-pool and pool handlers, and to otherwise correct the disruptive impact on the total regulatory scheme induced by importation of outside fluid milk.

The Supreme Court, however, rejected the solution as relying on certain defective premises. The Court found that only if particular market circumstances were present—and not as a matter of course—would the prescribed rate scheme bring about a true competitive parity. The Court, thus, concluded the section in question to constitute an illegal economic trade barrier respecting the entry of non-pool milk into the New York-New Jersey region. These restrictions, it was held, violated the letter and policy of § 8c(5) (G) of the Agriculture Marketing Agreement Act which disallows such prohibitions or limitation of milk products into any marketing area.[6]

6. 7 U.S.C. § 608c(5) (G).

It is to be noted that the crux of the *Lehigh* ruling rests in the actual discriminatory nature of the *rates* demanded of non-pool handlers introducing "outside" area milk. In the *Lehigh* case itself, for example, one of the petitioning handlers was required to remit $9.18 per hundredweight while the pool plant handlers were paying but $6.23.

■ At bar, however, the contested fluid skim differential engenders no such inherent or potential rate discrimination. Under § 1002.43, *all* handlers—pool or non-pool—make the identical payments. While the concerned skim milk differential may indeed be "compensatory" within the context of the regulatory scheme of Order 2, it is not so regarding any effort to control or restrict the flow of outside milk into the New York-New Jersey region. Since there is here no illegal burden within the meaning of § 8c(5) (G) placed on non-pool handlers, the *Lehigh* decision can have no applicability to the argument presented.

■ Controlling case law further imposes the burden of demonstrating an actual economic barrier in the operation of the challenged section. Hence, the mere allegation of similar marketing effect will not suffice to invalidate § 1002.-43. The fluid skim differential must be proven discriminatory within the meaning of *Lehigh*; it cannot be overruled by a purported analogy. For this reason, also, the court must sustain the administrative finding. United States v. Rock Royal Co-op., 307 U.S. 533, 567–568, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); United States v. Lewes Dairy, Inc., 337 F.2d 827, 829 (3d Cir. 1964).

Ancillary to the above-discussed contention, Sterling Davis maintains an additional ground for demanding partial returns of the fluid skim differential. Plaintiff alleges that during the months January 1959 through December 1960,

whatever skim milk it handled was derived from Class I milk only. Since Class I milk is expressly exempted from the § 1002.43 fluid skim differential, plaintiff claims complete exclusion for that period.

Regarding this allegation, the trial examiner in his Recommended Decision observed:

"No reports or records of any kind were introduced into evidence by petitioner in support of its protest against the assessments. Such oral testimony as was presented by petitioner, unsubstantiated by any record evidence, is unavailing for the reasons previously stated and as additionally unrelated to the specific assessments made."

■ The court cannot contest that record finding. Under the fluid skim differential section, payments are to be made "for all skim milk which is not established to have been otherwise utilized or disposed of." [7] Plaintiff's failure to adduce documentary evidence sufficient to demonstrate Class I derivation must liable it, therefore, to pay the differential for all of the months in question.

Lastly, an issue is raised concerning the time to bring refund actions under the *Lehigh* decision.

For June of 1958, Sterling Davis Dairy paid some $882.26 into the Producer Settlement Fund as a compensatory payment pursuant to § 927.83 of former Order 27. On June 4, 1962, the *Lehigh* case invalidated this specific provision providing for payments by handlers on milk received from dairy farmers at non-pool plants. Plaintiff, on February 25, 1963, petitioned for a refund of the $882.-26 upon the basis of the *Lehigh* ruling.

Such petition was rejected in the Department of Agriculture proceedings on the theory that the claim was barred by the governing two-year statute of limitations.[8] Plaintiff asserts, however, that

7. Cf., discussion supra on the burden of establishing milk classification.

8. The section relied on by the Secretary, 7 C.F.R. § 1002.95(d), reads in pertinent part that:

"Any obligation on the part of the market administrator to pay a handler any money which the handler claims to be due

because the Supreme Court declared the controverted section void *ab initio*, any payment made pursuant thereto must be illegal and hence retroactively returned.

The court finds the problem one of unique incidence. No case law has been cited nor any found bearing on this precise issue. The better reasoning, nevertheless, compels denial of the refund.

First, we cannot interpret the *Lehigh* decision as effecting a blanket negation of either the general scheme there considered, or all comparable means of rate regulation. The Supreme Court in *Lehigh* went to great lengths to delimit the operative scope of its ruling. Thus, Justice Harlan emphasized it was "with respect to these petitioners," speaking of the particular petitioners bringing the *Lehigh* litigation, "that the action of the Secretary * * * exceeded the powers entrusted to him by Congress." *Lehigh* 370 U.S. at 99, 82 S.Ct. at 1181. Implicit in this judicial qualification is a rejection of any *ab initio* voidance extending to all handlers whether or not adversely affected.

Second, and closely related to the initial rationale, is the presence of the overriding equitable nature of refund payment of administrative assessments. The court, therefore, is motivated by the obligation of fairness, rather than mechanical application of the positive law. See, e. g. Interwoven Stocking Co. v. United States, 144 F.2d 768 (3d Cir. 1944), involving tax refunds pursuant to a Supreme Court ruling invalidating certain taxing provisions of the Agriculture Adjustment Act of 1933.

██ In relation to the above discussion, the court is again struck by plaintiff's failure to demonstrate any real losses incurred due to discriminatory operation of § 927.83 of the old New York-New Jersey order. Certainly, if Sterling Davis Dairy could prove that the compensatory payment of June 1958 was in excess of that paid by in-area handlers, and that an unfair rate induced this excess, it might qualify for relief under the *Lehigh* ruling. The mere allegation of a vague association with the invalidated scheme, as is made here, cannot suffice to compel a refund of all and any payments. Confronted with the absence of proofs showing adversity due to rate discrimination, the court must deny the requested relief.

In summary, on the entire record, the court finds the contested administrative rulings to be both founded in substantial evidence and in accordance with the governing law. The short of the matter is that plaintiff dairy has never fully complied with the record-keeping demands of the New York-New Jersey milk order. It has consequently placed the Market Administrator in the position of having to engage in statistical speculation. This circumstance Congress clearly wished to avoid. Under the Act and the milk order the burdens and consequent penalties for failure to abide by the elaborate scheme of reporting fall on the plaintiff. It has not met these burdens.

A form of order in accordance with this disposition is to be submitted.

him * * * shall terminate two years after the end of the calendar month during which the milk involved in the claim was received * * *."