## UNITED STATES v. TWO BAGS, EACH CONTAINING 110 POUNDS, POPPY SEEDS, et al.

### No. 9852.

Circuit Court of Appeals, Sixth Circuit.

Jan. 31, 1945.

Fred H. Mandel, of Cleveland, Ohio (Tom C. Clark, of Washington, D. C., Don C. Miller and Fred H. Mandel, both of Cleveland, Ohio, James B. Goding, Atty., Federal Security Agency, of Boston, Mass., and Vincent A. Kleinfeld, of Washington, D. C., on the brief), for appellant.

George X. Levine, of New York City, for appellee.

Before HAMILTON, MARTIN, and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The District Court dismissed a complaint filed as a libel in rem on information by the United States Attorney for the Northern District of Ohio for the seizure and condemnation of two bags, more or less, each containing 110 pounds of poppy seeds, shipped in interstate commerce from Brooklyn, New York, to Cleveland, Ohio; and ordered the seized goods returned to the owner. The libel was grounded upon averments that the poppy seeds were adulterated within the meaning of Section 402(b) (3) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 342(b) (3), which provides: "A food shall be deemed to be adulterated— * * * (3) if damage or inferiority has been concealed in any manner;" and of Section 402(b) (4) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 342(b) (4), which provides: "A food shall be deemed to be adulterated— * * * (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it

appear better or of greater value than it is."

Upon the evidence in the case, the district court found that the owner and claimant of the seized merchandise, the Arco Products Company of Brooklyn, New York, had shipped the poppy seeds in interstate commerce to jobbers, and not to ultimate consumers; that the poppy seeds were intended to be used as food and components of food for human consumption; and prior to shipment had been colored by charcoal pigment made from burnt poppy seeds. It was found further that these poppy seeds, products of British India, were naturally of a whitish color and, when uncolored, had a market value ranging from ten to eleven cents a pound; but, when artificially colored, they had a market value of about twenty-two-and-a-half cents a pound. There was a marked difference in the market value of these British India poppy seeds, on the one hand, and Dutch blue and Turkish grey poppy seeds, on the other. The latter were much more expensive. The coloring of the Dutch and Turkish seeds was natural and they were somewhat larger than the British India, white poppy seeds.

The Dutch and Turkish seeds have been used extensively—indeed, almost exclusively—for decorative and flavoring purposes in the manufacture of bread, rolls and other baked goods. After the United States became involved in World War II, the Dutch blue and Turkish grey poppy seeds were hardly procurable at all, making the British India product the only available poppy seeds on the market.

The Arco Products Company devised a method of coloring British India white poppy seeds with charcoal pigment, made from burnt poppy seeds; so that, as found by the district court, the "British India white poppy seeds resembled in color and shape the genuine Dutch blue and Turkish grey poppy seeds, except that the artificially colored seeds were of a size smaller, and had a more uniformly black or dark grey shade than the genuine Dutch blue and Turkish grey poppy seeds respectively."

The court found further that there is little, if any, difference in flavor, and no difference in food value of the naturally and the artificially colored seeds; and that a person inexperienced in such matters would fail to notice the difference between the Dutch blue or Turkish grey poppy seeds and the artificially colored British India white poppy seeds. It was found that the purpose of the Arco Products Company in the coloration was to impart "eye appeal" to the white poppy seeds which were shipped by it in interstate commerce, to jobbers only, in bags labeled: "Produce of British India. Artificially colored with vegetable colors."

Pointing out that jobbers in the trade were well aware of the difference between the poppy seeds, whether in their natural state or artificially colored, and could not have been deceived by the artificial coloring, particularly where the seeds were shipped in bags with informative labels, the district court concluded its findings of fact with this important finding:

"The addition of charcoal pigment made from burnt poppy seeds to the British India white poppy seeds tended to conceal the price inferiority of said poppy seeds in the hands of the ultimate consumers, but not the jobbers, and tended to make them appear better and of greater value than they were in that the inferiority thereof had been concealed by addition of substance, charcoal, and that the substance, charcoal, had been added thereto so as to make it appear better or of greater value than it was."

This last finding, as was each of the other findings of the court, was supported by substantial evidence.

In a memorandum opinion, 54 F.Supp. 706, 707, the district judge stated that, on all the testimony, the questions presented were whether the article is adulterated within the meaning of Section 342(b) (3), Title 21 U.S.C.A., in that inferiority has been concealed by addition of charcoal; and whether the article is adulterated within the meaning of Section 342(b) (4), 21 U. S.C.A., in that charcoal has been added thereto so as to make the article appear better or of greater value than it is. He thus answered the questions which he put: "If those questions are answered with reference to retailers and consumers they would have to be answered in the affirmative. If, however, they are answered with reference to jobbers, the evidence convinces the court that they should have a negative answer. In spite of the fact that the British India seeds on close examination reveal a smaller size and a more uniformly black or very dark grey shade and that Dutch blue and Turkish seeds are somewhat larger and contain variegated shades of color, still a cursory look at the seeds would reveal no difference. Anyone inex-

perienced in such matters would fail to note the difference between the naturally dark seeds and the artificially colored seeds. While the difference in flavor, if any, is slight and there is no difference in food value, there is nevertheless a difference in commercial value or price, and the coloring of the white seeds does conceal that price inferiority and does make the white seeds appear better or of greater value than they are."

Inasmuch as jobbers, who were the consignees, were well aware of the distinctions between the seeds, the district court reasoned that "the legality of the product must be tested by its condition at the time of seizure and not by what its condition might be after it has passed beyond interstate commerce channels or been transposed from the packages in which it was shipped or changed in form or content"; that "if the public is to be protected against the sale of colored poppy seeds unlabeled or improperly labeled it will require state law and state administration"; that "if the interstate shipment is not a 'palming off' of something inferior it is not in violation of the statute merely because it has a potentiality of deception"; and that it having been found that the seeds involved in the case were labeled and billed for what they actually were, the court should not treat them as contraband "merely because of the possibility that they might be used subsequently to deceive."

■ We are unable to agree with the reasoning of the district court; and think that, the article having been found to be adulterated within the meaning of Sections 342(b) (3) and 342(b) (4), insofar as consumers are concerned, the seized seeds should have been condemned under the Federal Food, Drug and Cosmetic Act. To set up deception of jobbers as the criterion for the determination of the issue of condemnation was, in our judgment, clearly erroneous. The express language of the pertinent provisions of the Act of Congress is reasonably susceptible of no such narrow interpretation. The district court found as a fact that the inferiority of the food had been concealed; that an added substance had made it appear better or of greater value than it is insofar as the ultimate consumer was affected; and that an inexperienced person would fail to detect the difference between the natural Dutch blue or Turkish grey poppy seeds and the artificially colored British India white seeds, shipped in interstate commerce by the Arco Products Company.

In construing the original Pure Food and Drugs Act of 1906, 21 U.S.C.A. § 1 et seq., the Supreme Court pointed out that the statute rests upon the power of Congress to regulate interstate commerce; that no trade can be carried on between the states to which this power does not extend; that it is complete in itself, subject to no limitations except those found in the Federal Constitution; and that it must be remembered that the Act deals with illicit articles, which the law seeks to keep out of commerce and to punish, along with the shipper of them, because the articles are debased by adulteration. Hipolite Egg Co. v. United States, 220 U.S. 45, 57, 31 S.Ct. 364, 55 L.Ed. 364.

In Carolene Products Company v. United States of America, 65 S.Ct. 1, 8, decided November 6, 1944, the Supreme Court said: "When Congress exercises a delegated power such as that over interstate commerce, the methods which it employs to carry out its purposes are beyond attack without a clear and convincing showing that there is no rational basis for the legislation; that it is an arbitrary fiat."

■ The right both of a state and of Congress to go beyond the protection of the public by prohibition of false labeling or branding of goods to more adequate protection by the prohibition of a substituted food product has been held by the highest court to be within the legislative power. United States v. Carolene Products Co., 304 U.S. 144, 151, 58 S.Ct. 778, 82 L. Ed. 1234; Hebe Co. v. Shaw, 248 U.S. 297, 302, 303, 39 S.Ct. 125, 63 L.Ed. 255. Moreover, the Supreme Court has declared that the Food and Drugs Act was not intended to be confined to the requirement of truthful labeling of goods, but that the statute was intended to protect the public against adulteration of articles of food by the addition of substances deleterious to the health of consumers. United States v. Coca Cola Co., 241 U.S. 265, 277, 278, 36 S.Ct. 573, 60 L.Ed. 995, Ann.Cas.1917C, 487. Consult to same effect Commonweath of Pennsylvania v. Hettinger, 152 Pa. Super. 242, 31 A.2d 599.

In Federal Securities Administrator v. Quaker Oats Co., 318 U.S. 218, 230, 63 S. Ct. 589, 596, 87 L.Ed. 724, the Chief Justice leaves no doubt that, from its text and legislative history, the purpose of the present Federal Food, Drug and Cosmetic Act

was not confined to a mere requirement of truthful and informative labeling, which had been found inadequate to protect the consumer from "'economic adulteration', by which less expensive ingredients were substituted, or the proportion of more expensive ingredients diminished, so as to make the product, although not in itself deleterious, inferior to that which the consumer expected to receive when purchasing a product with the name under which it was sold."

■ Upon the principles of that case, "economic adulteration" in contravention of the Act could not be avoided in the instant case by the limited effect which the district court gave to the express language of the Act. Here, the consumer would be unaware that less expensive ingredients had been substituted and that the article was inferior to that which he expected to receive when making his purchase. The fact that the substituted article was not deleterious is immaterial. From its inception, to its last amendment, the Pure Food and Drugs Act was not designed primarily for the protection of merchants and traders; but was intended to protect the consuming public.

In Carolene Products Company v. United States of America, 4 Cir., 140 F.2d 61, 65, Judge Dobie declared: "Congress may with constitutional impunity bar from interstate commerce goods which may be the subject of a fraudulent sale, although the goods themselves may not be injurious." On appeal of the case, this principle was upheld and the judgment was affirmed. Carolene Products Company v. United States of America, supra.

■■ It would seem clear beyond controversy that Congress has ample power to keep the channels of interstate commerce free from the transportation of illicit or harmful articles; and that the object of the Food and Drugs Act is to prevent the misuse of the facilities of interstate commerce in either conveying to or placing before the consumer misbranded or adulterated articles of medicine or food; and, by later amendment, cosmetics. McDermott v. Wisconsin, 228 U.S. 115, 128, 131, 33 S.Ct. 431, 57 L.Ed. 754, 47 L.R.A.,N.S., 984, Ann. Cas.1915A, 39.

■ Whether dealers or traders in articles are deceived is not the material question. The appropriate inquiry is whether the ultimate purchaser will be misled.

Libby, McNeil & Libby v. United States, 4 Cir., 210 F. 148. Compare United States v. 7 Jugs, etc., of Dr. Salsbury's Rakos, D. C., 53 F.Supp. 746, 752. As was said by the Supreme Court, in United States v. Antikamnia Co., 231 U.S. 654, 665, 34 S.Ct. 222, 225, 58 L.Ed. 419: "The purpose of the act is to secure the purity of food and drugs, and to inform purchasers of what they are buying. Its provisions are directed to that purpose and must be construed to effect it." See also United States v. Schider, 246 U.S.. 519, 522, 38 S.Ct. 369, 62 L.Ed. 863; United States v. Research Laboratories, 9 Cir., 126 F.2d 42, 45.

In United States v. Dotterweich, 320 U. S. 277, 280, 64 S.Ct. 134, 136, the Supreme Court gave recent expression to the view that the act under consideration should be liberally construed, so as to effectuate its purpose: "The Food and Drugs Act of 1906 was an exertion by Congress of its power to keep impure and adulterated food and drugs out of the channels of commerce. By the Act of 1938, Congress extended the range of its control over illicit and noxious articles and stiffened the penalties for disobedience. The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words. See Hipolite Egg Co. v. United States, 220 U.S. 45, 57, 31 S.Ct. 364, 367, 55 L.Ed. 364, and McDermott v. Wisconsin, 228 U.S. 115, 128, 33 S.Ct. 431, 433, 57 L.Ed. 754, 47 L.R.A., N.S., 984, Ann.Cas.1915A, 39."

■ The erroneous conclusion reached by the district court seems to stem from confusion concerning the primary purpose of the Act, which, as has been demonstrated, is not protection of jobbers, dealers, or traders, but protection of the ultimate consumer. The court failed to apply correctly the principle that the true test is whether the article was adulterated when shipped and while in interstate commerce. Only six cases were cited in the opinion below: United States v. 492 Cases, More or Less, of Orange Juice, Each Case Containing Two One-Gallon Jugs, D.C., 20 F.Supp. 520, affirmed in United States v. Nesbitt Fruit Products, Inc., 5 Cir., 96 F.2d 972; United States v. Lexington Mill Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658,

L.R.A.1915B, 774; United States v. Great Atlantic & Pacific Tea Co., 2 Cir., 92 F.2d 610, 113 A.L.R. 961; Austin v. Tennessee, 179 U.S. 343, 21 S.Ct. 132, 45 L.Ed. 224; Sonneborn Bros. v. Cureton, 262 U.S. 506, 43 S.Ct. 643, 67 L.Ed. 1095; Schechter Corp. v. United States, 295 U.S. 495 (Syllabus 3, 4), 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. We think the district court misapplied these authorities. The opinion states that "it seems to this court that this case falls within the principle announced in United States v. 492 Cases Orange Juice, supra, United States v. Nesbitt Fruit Products, 5 Cir., 96 F.2d 972, and in United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658, L.R.A.1915B, 774."

The first two citations refer to the same case, which might be called the "orange juice" case, in which the action of a district court in dismissing a libel was affirmed. The opinion on appeal makes plain the factual differentiation from the case at bar. The Court of Appeals said [96 F.2d 973]: "The retailer who buys these jugs of Nesbitt's product, which are shipped in interstate commerce, does not buy them as orange juice but as a mixture whose ingredients are disclosed from which he may prepare a beverage. In practice the jug is placed upon the retailer's counter with the full label in plain view, and the dilution is made in the customer's presence." But Judge Foster even dissented from the majority view that the consumer would not be deceived, and said: "I consider the label tends to deceive and mislead the ultimate purchaser and therefore the article is misbranded within the prohibition of the Food and Drugs Act." In the orange juice case, there was no finding of fact that the ultimate consumer would be misled. In the instant case, the contrary is true. In the orange juice case, the adulteration occurred after the product was no longer in interstate commerce; in the instant case, the adulteration occurred before the goods were placed in interstate commerce and existed at the time of seizure.

The other case which the district court considered controlling, United States v. Lexington Mill Co., 232 U.S. 399, 409, 34 S.Ct. 337, 340, 58 L.Ed. 658, L.R.A.1915B, 774, expressly recognized that the primary purpose of Congress in enacting the Food and Drugs Act was to prevent injury to the public health by the sale and transportation in interstate commerce of misbranded and adulterated foods; and that "if this purpose has been effected by plain and unambiguous language, and the act is within the power of Congress, the only duty of the courts is to give it effect according to its terms." On the facts of the case, the bleaching of the flour in the manner employed was not deemed deceptive; while, in the instant case, the district court found that the inferiority of the article shipped in interstate commerce was concealed from the consumer, and the article was made to appear to him better or of greater value than it is.

In our judgment, the other four citations in the opinion of the district court are irrelevant in the context.

The Circuit Court of Appeals for the Second Circuit has held that the intended use to which adulterated food is to be put, after it has been shipped in interstate commerce, is immaterial on the issue of the government's right to forfeit the food because of the interstate commerce shipment. United States v. 52 Drums Maple Syrup, 110 F.2d 914. See also Union Dairy Co. v. United States, 7 Cir., 250 F. 231, 233.

As was declared in United States v. Thirteen Crates of Frozen Eggs, 2 Cir., 215 F. 584, 585, the Food and Drug's Act could not be enforced if the government is compelled to establish a wrongful intent on the part of those who ship prohibited articles in interstate commerce. It is enough that the articles are prohibited; and all that is necessary to be shown to justify condemnation is that the adulterated article of food has been transported in interstate commerce.

Appellee stresses United States v. Ten Cases, More or Less, Bred Spred, 8 Cir., 49 F.2d 87. In that case, there was no showing of the inferiority of the food product sought to be condemned. Here, the poppy seeds shipped by the appellee were of less commercial or market value; were of smaller size; and were artificially colored so that, as found by the district court, "a person inexperienced in such matters would fail to notice the difference between the Dutch blue or Turkish grey poppy seeds and the artificially colored British India white poppy seeds." The Eighth Circuit decision, therefore, gainsays nothing which we have said in this opinion, and, moreover, adheres to the doctrine that the primary purpose of the Food and Drugs Act is to prevent injury to the public health by the transportation in inter-

state commerce of misbranded and adulterated foods.

The judgment of the district court is reversed, with direction that a decree of condemnation be entered in conformity with the prayer of the libel in rem filed by the United States.