## LIBBY, McNEILL & LIBBY v. UNITED STATES.
### No. 199.

Circuit Court of Appeals, Second Circuit.

March 8, 1945.

Breed, Abbott & Morgan, of New York City (Michael F. Markel, of New York City, and Lyndle W. Hess, of Chicago, Ill., of counsel), for appellant.

Tom C. Clark, Asst. Atty. Gen., T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y., Morris K. Siegel, Asst. U. S. Atty., of New York City (Vincent A. Kleinfeld, Atty., Department of Justice, and Arthur A. Dickerman, Atty., Federal Security Agency, both of Washington, D. C., of counsel), for appellee.

Before HUTCHESON, SIMONS, and CLARK, Circuit Judges.

SIMONS, Circuit Judge.

The Federal Security Administrator charged with enforcement of the Federal Food, Drug, and Cosmetic Act, acting under authority of § 401, 21 U.S.C.A. §§ 343(g), (k), 341, promulgated regulations establishing a definition and standard of identity for tomato catsup. The appellant produced and shipped in interstate commerce the condemned food product which concededly does not conform to the standard in that it contains sodium benzoate, a substance not permitted as an ingredient. The government's libel charged that the food was misbranded in violation of § 403(g), and this the appellant, as claimant, denies on the ground that the product was not sold as tomato catsup but as "tomato catsup with preservative", the labels upon the containers specifically declaring that

the product does not conform to government standard for catsup, and contains 1/10 of 1% benzoate of soda.

Sections 403(g), (k), of the Act declare when a food is deemed to be misbranded, and insofar as the provisions are pertinent, they are printed in the margin.[1] The sole contention urged upon appeal is that the seized product being truthfully labeled, not deceptively packaged, and sold under a name accurately descriptive of its composition, is not misbranded within the meaning of § 403(g), because of the presence in the food of the sodium benzoate. It is urged that the branding of a product as relating to its characteristics and composition, is the sole basis for determining whether it is misbranded, and that the section does not have the effect, nor was it intended by Congress to have the effect of excluding any product from interstate commerce when it is sold for what it is. As a supplementary proposition, it is urged that misbranding of the specific product seized is not to be established by designations of identical products applied to them not by their producer but by retail dealers to their customers.

As produced and shipped by the appellant, the condemned food is packed in #10 cans with the described labels thereon. It is catsup as defined by the Administrator, to which there has been added the minute quantity of sodium benzoate as a chemical preservative. This preservative is harmless, is commonly used in other foods, including oleomargarine, preserves, and jellies, and does not affect the viscosity, taste, smell, or appearance of the catsup. It is explained that there is a wide variation in the degree of concentration of catsup, and a well-established practice in the trade to call a catsup of the higher concentration "fancy", and that of the lower concentration "standard". The difference in specific gravity between the two products is due to the difference in the quantity of added sugar, and the amount of added sugar is determined by the quantity of vinegar added. Catsup is rendered virtually sterile by heat processing, but will spoil after opening unless it contains a preserving agent. Vinegar, sugar, and salt, in combination, are good preserving agents when added in sufficiently large quantities. The amounts required by the standard are relatively small because added only as seasoning ingredients, so it had been the practice in the industry, quite generally, up to 1940, to add sodium benzoate to a lower concentration so as to give it a keeping quality comparable to catsup preserved by added sugar and vinegar.

While fancy catsup is packed in bottles for table use, standard catsup is packed in #10 cans and sold primarily to hotels, restaurants, and similar establishments, although standard catsup, to some extent, is used as table catsup in low priced restaurants. Generally, however, standard catsup is used in cooking and in the preparation of sauces. It costs about 25% less than table catsup because it contains less sugar which is a costly ingredient, and is in response to a demand for a less expensive product.

The district court found the product under seizure to conform in all respects to the definition and standard promulgated by the Administrator, except for the addition of the small quantity of benzoate of soda, but held that it purported to be catsup, and so, since it did not conform to the standard, was misbranded. Decision therefore turns upon the meaning of the word "purport" as used in § 403(g). The appellant contends that the label is controlling, that its product does not thereby purport to be catsup, even though it conforms in all respects to the standard, except for the added ingredient. It is a specific article, namely, tomato catsup with preservative, and since its label truthfully so indicates, there is no misbranding. The label may be disregarded only if it is assumed that § 403(g) expresses an intent on the part of the Congress to outlaw the manufacture of foods not conforming to applicable stand-

---

[1] "Sec. 403. A food shall be deemed to be misbranded—

\* \* \* \* \* \*

"(g) If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 401, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food.

\* \* \* \* \* \*

"(k) If it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact: \* \* \* ."

ards which, but for the standard, would be sold under the same common and usual name.

It is impossible for us, in the light of controlling authority, to accept the contention. The condemned food is tomato catsup, and purports to be tomato catsup.[2] If producers of food products may, by adding to the common name of any such product mere words of qualification or description, escape the regulation of the Administrator, then the fixing of a standard for commonly known foods becomes utterly futile as an instrument for the protection of the consuming public. Here is no arbitrary or fanciful name, neither "representative or misrepresentative" of a common food product, as in Judge Geiger's unreported case of United States v. 24-7/8 Gallons of Smack, D.C., E.D.Wis.1926.[3] Such designations invite inquiry as to what the food really is. The present product is intended to satisfy the demand and supply the market for—catsup. Emphasis is laid on its conforming to standard except for the preservative. The argument defeats itself, for if it is an article of food, distinguished from the standard by the qualification, then other ingredients may be added or defined ingredients or processes omitted without conflicting with the regulation, if containers are truthfully labeled.

In Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724, it was said that the statutory purpose to fix a definition of identity of an article of food sold under its common or usual name, would be defeated if producers were free to add ingredients, however wholesome, which are not within the definition, and so it was not an unreasonable choice of standards for the Administrator to adopt one which defined the familiar farina of commerce without permitting vitamin enrichment, and at the same time a standard for "enriched" farina which permitted a restoration of vitamins removed from whole wheat by milling. The respondent in that case had marketed "Quaker Farina Wheat Cereal, Enriched with Vitamin D." Since this did not conform either to the standard adopted for farina, or to the standard adopted for enriched farina, it was held to be misbranded,

although the label there as truthfully described the product as does the present label. The district judge was unable to distinguish the present case from the Quaker Oats case, and neither can we.

In reviewing the text and legislative history of the present statute, Mr. Justice Stone, in the Quaker Oats case, pointed out that its purpose was not confined to a requirement of truthful and informative labeling. False and misleading labeling had already been prohibited by the 1906 Act. The remedy chosen was not a requirement of informative labeling, rather, it was the purpose to authorize the Administrator to promulgate definitions and standards of identity under which the integrity of food products could be effectively maintained, and to require informative labeling only where no such standard had been promulgated; where the food did not purport to comply with the standard; or where the regulations permitted optional ingredients, or required their mention on the label, and that the provision for such standards of identity reflect a recognition by Congress of the inability of consumers to determine, solely on the basis of informative labeling, the relative merits of a variety of products superficially resembling each other. The court was unable to say that such standard of identity, designed to eliminate a source of confusion to purchasers, will not promote honesty and fair dealing within the meaning of the statute.

Neither the decision nor its rationalization in the Quaker Oats case, can be escaped by a product that looks, tastes, and smells like catsup, which caters to the market for catsup, which dealers bought, sold, ordered, and invoiced as catsup, without reference to the preservative, and which substituted for catsup on the tables of low priced restaurants. The observation in the opinion that it was the purpose of the Congress to require informative labeling, "where the food did not purport to comply with a standard" is not to be lifted out of its context, given a meaning repugnant to the decision, so as to limit "purport" to what is disclosed by the label and to that alone.

The contention that Congress did not intend to, and may not prohibit ship-

---

2 The Canners' League of America, of which the appellant is a member, vainly sought an amendment to the standard for catsup. No standard was sought for catsup with preservative, nor was review had of the Administrator's rejection of the amendment.

3 Notice of judgment under Food and Drugs Act (1906) No. 41,416 (White and Gates, Decisions, p. 1181).

ment of non-deleterious substances, is fully answered both in the Quaker Oats case and United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234, where the regulation is in the interest of consumers. Libby, McNeill & Libby v. United States, 4 Cir., 210 F. 148. While the recent case in the Sixth Circuit, United States v. Two Bags Each Containing 110 Pounds Poppy Seeds, 147 F.2d 123, involved a libel under the adulteration section of the Act, § 402(b) (3) and (4), 21 U.S.C.A. § 342(b) (3, 4), it was there held that the appropriate inquiry is whether the ultimate purchaser will be misled. The contention of the appellant that transactions subsequent to the interstate movement of a food have no bearing upon whether the regulation or standard is avoided, and which is supported only by reference to the Poppy Seed case in the district court, 54 F.Supp. 706, now reversed, must be rejected. Nolan v. Morgan, 7 Cir., 69 F.2d 471 and United States v. Nesbitt Fruit Products, Inc., 5 Cir., 96 F.2d 972, did not involve standards of identity, and both cases were decided prior to the Quaker Oats case. The argument that an affirmance of the decision below will prevent the development of new foods and "lay a dead hand on progress" is one that may more appropriately be addressed to the Administrator or to Congress than to the courts.

The order of condemnation is affirmed.