**UNITED STATES v. 62 CASES, MORE OR LESS, CONTAINING SIX JARS OF JAM, etc.**

**No. 4039.**

United States Court of Appeals
Tenth Circuit.

June 27, 1950.

Rehearing Denied July 22, 1950.

John T. Grigsby, Atty., Dept. of Justice, Washington, D. C. (James M. McInerney, Asst. Atty. Gen., Everett M. Grantham, U. S. Atty., Albuquerque, N. M., Albert H. Clancy, Asst. U. S. Atty., Santa Fe, N. M. and Vincent A. Kleinfeld, Atty., Dept. of Justice, Leonard D. Hardy, Atty., Federal Security Agency, Washington, D. C., were on the brief), for appellant.

Benjamin F. Stapleton, Jr., Denver, Colo. (Ireland, Ireland, Stapleton & Pryor and Clarence L. Ireland, all of Denver, Colo. were on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal from a libel brought by the United States pursuant to 21 U.S.C.A. § 334(a), seeking the seizure and condemnation of 62 cases of fruit jam of assorted flavors. The libel alleged that the jam was misbranded within the meaning of 21 U.S. C.A. § 343(g), when introduced into and while in interstate commerce and while held for sale after shipment in interstate commerce, because it purported to be and was represented as a fruit jam, a food for which definitions and standards of identity had been prescribed pursuant to 21 U.S.C.A. § 341, and it failed to conform to such definitions and standards in that it was deficient in fruit and was not concentrated to the degree required by the standards.

21 U.S.C.A. § 341, in part, reads:

"Whenever in the judgment of the [Federal Security] Administrator such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity, a reasonable standard of quality and/or reasonable standards of fill of container * * *."

21 U.S.C.A. § 343, in part, reads:

"A food shall be deemed to be misbranded—

"(c) If it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated."

"(g) If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, * * *."

The definitions and standards of identity for fruit jams, which were established pursuant to 21 U.S.C.A. § 341, after public proceedings, conducted in accordance with 21 U.S.C.A. § 371(e), provide that fruit jams shall be composed of not less than 45 parts by weight of fruit to each 55 parts by weight of one of the designated saccharine ingredients, and that the soluble solids content of blackberry, strawberry and grape jam be not less than 68%, and of apricot, peach and plum jam, not less than 65%. The jams[1] under seizure contained the ingredients provided for in the standards, but the amount of fruit was greatly reduced. They contained 55% sugar, 25% fruit and 20% of a water solution of pectin and were labeled "Imitation (here was inserted the name of the fruit used) Jam."[2] Below the name of the fruit and word "Jam" on the label there appears in very small type the following: "Made from 55% sugar, 25% fruit, 20% pectin, citric acid, 1/10 of 1% benzoate of soda."

The facts rest on stipulated admissions and agreement as to what persons would testify, if called as witnesses. It was thus established that the jams under seizure, when introduced into and while held in interstate commerce, failed to conform to the definition and standard of identity which had been prescribed for fruit jam, pursuant to 21 U.S.C.A. § 341, in that they were deficient in fruit and were not concentrated to the degree required by the standard; that the five-pound two-ounce size of such jams was served by hotel dining rooms, restaurants and other public eating places to their patrons as fruit jam, without disclosure that the containers from which the food was taken were labeled "Imitation Jam"; that retail grocery stores advertised such jams as fruit jams, and in response to telephone calls from housewives, asking for the advertised jams, filled such orders with the product here involved; that ranches and logging camps served such jams to their employees as jam and such employees consumed it, believing it to be fruit jam, and that such jams looked like and tasted like fruit jam, and that such jams are wholesome and have food value.

The trial court found that the jams under seizure had the appearance of fruit jams for which a definition and standard of identity had been established; that such jams were made to taste like and did taste like standard fruit jams; that they were used by consumers in the place of and as a substitute for standard fruit jams; that they were often advertised as jam and that orders by the consuming public for jam were frequently filled by delivery of such jams; and that they were served by hotels in response to orders for jams or preserves without disclosure that they did not comply with the requirements for standard fruit jam. Notwithstanding these findings, the court concluded that the jams under seizure did not purport to be, and were not represented as fruit jam, and that they were imitation fruit jams and properly labeled under 21 U.S.C.A. § 343(c).

The jams under seizure contain fruit, sugar and the other usual ingredients of fruit jam; they look and taste like fruit jam, and they are sold and served to customers as fruit jam. They are a sub-standard jam. They are not imitation fruit jam. We think the undisputed facts show that they purported to be, and were represented to be a fruit jam, for which a definition and standard of identity had been prescribed.

The text and legislative history of the statute, Sub-chapter IV of the Federal

---

1. Such jams were grape, strawberry, apricot, plum, peach and blackberry.

2. The name of the fruit and the word "Jam" were in larger and bolder letters than the word "Imitation."

Food, Drug and Cosmetic Act, 52 Stat. 1040, 1046, 21 U.S.C.A. § 341–346, show that its purpose was not confined to a requirement of truthful and informative labeling. The Pure Food and Drug Act of 1906, 34 Stat. 768, prohibited false and misleading labeling, but it had been found that such a prohibition was not adequate to protect the consumer from "economic adulteration" by the substitution of less expensive ingredients, or by diminishing the proportion of more expensive ingredients so as to make the product, although not deleterious, inferior to well-recognized standards adhered to by housewives and most manufacturers, and inferior to what the consumer expected to receive when purchasing it under the name it was sold.[3] (Sen.Rep.No. 493, 73d Cong., 2d Sess., p. 10; Sen.Rep.No. 361, 74th Cong., 1st Sess., p. 10.) Congress, by § 341 and § 343(g), did not undertake to remedy the evil by a requirement of informative labeling. Rather, it authorized the Administrator to promulgate definitions and standards of identity, "under which the integrity of food products can be effectively maintained," (H.R.Rep. 2139, 75th 'Cong., 3d Sess., p. 2; H.R.Rep. 2755, 74th Cong., 2d Sess., p. 4) and provided for informative labeling only where no such standard had been promulgated; where the food did not purport to be a food for which a standard had been promulgated, or where the regulation permitted optional ingredients and required them to be set forth on the label. "The provisions for standards of identity thus reflect a recognition by Congress of the inability of consumers in some cases to determine, solely on the basis of informative labeling, the relative merits of a variety of products superficially resembling each other." [4]

It is significant that Congress in § 343(g), in dealing with misbranding by failure to conform to the definition and standard of identity, did not permit departure from the standard if the label disclosed that the food did not conform to the standard, whereas in § 343(h) (1) (2), in dealing with misbranding by failure to conform to standard of quality and standards of fill of container, Congress permitted departure from the standard if the label on the food set forth, in the manner and form specified in the regulation, a statement that it fell below the standard, thus indicating a Con-

---

**3.** Prior to the enactment of the Federal Food, Drug and Cosmetic Act of June 25, 1938, the United States brought a libel asking the seizure and condemnation of a food known as Bred Spred. It contained strawberry flavor, 17 parts of strawberries, 55 parts of sugar, 11½ parts of water, ¼ part of pectin and .04% of a part of tartaric acid. It was not deleterious, but it failed to meet the standards recognized for jam by manufacturers, of not less than 45 parts of fruit to 55 parts of sugar, and by housewives, of 50% fruit and 50% sugar. The trial court denied seizure and condemnation and on appeal the court of appeals affirmed. See United States v. 10 Cases More or Less, Bred Spred, 8 Cir., 49 F.2d 87.

In H.R.Rep. 2139, 75th Cong., 3d Sess., p. 5, the following appears:

"Section 401 [21 U.S.C. 341] provides much needed authority for the establishment of definitions and standards of identity and reasonable standards of quality and fill of container for food. One great weakness in the present food and drugs law is the absence of authoritative definitions and standards of identity except in the case of butter and some canned foods. The Government repeatedly has had difficulty in holding such articles as commercial jams and preserves and many other foods to the time-honored standards employed by housewives and reputable manufacturers. The housewife makes preserves by using equal parts of fruit and sugar. The fruit is the expensive ingredient, and there has been a tendency on the part of some manufacturers to use less and less fruit and more and more sugar.

"The Government has recently lost several cases where such stretching in fruit was involved because the courts held that the well-established standard of the home, followed also by the great bulk of manufacturers, is not legally binding under existing law."

**4.** Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 230, 63 S.Ct. 589, 87 L.Ed. 724, 158 A.L.R. 832; Libby, McNeill & Libby v. United States, 2 Cir., 148 F.2d 71, 73; United States v. 716 Cases, More or Less, etc., Del Comida Brand Tomatoes, 10 Cir., 179 F. 2d 174.

gressional intent to permit departure from standards of quality and fill of container, where such departure was shown by truthful labeling, but not to permit a departure from a definition and standard of identity, even though such departure was disclosed by the label.

■ Whether a food purports to be, or is represented to be, a food for which a definition and a standard of identity has been prescribed by regulation, is not to be determined solely from obscure disclosures on the label. If it is sold under a name of a food for which a definition and standard has been prescribed, if it looks and tastes like such a food, if it is bought, sold and ordered as such a food, and if it is served to customers as such a food, then it purports to be, and is represented to be, such a food.[5]

■ We conclude that the jams under seizure purported to be, and were represented to be, fruit jams, for which a definition and standard of identity had been promulgated; that they did not conform to the definition and standard of identity, and that the manufacturer could not escape the impact of § 341 and § 343(g) by labeling them imitation jams and by truthfully setting forth on the label the proportions of sugar, fruit and other ingredients contained therein.

■ It is urged that the effect of our decision will be to compel the manufacturer of these jams to take such product off the market and to deprive persons of modest means of an inexpensive and wholesome food product; and that the portion of the Senate Committee Report set forth in Note

6, infra, shows the Congress did not intend the operation of § 343(g) to produce such results. But the results envisioned will not necessarily follow. The manufacturer may market the product as syrup and fruit thickened with pectin, or syrup flavored with fruit and thickened with pectin, but the product may not be lawfully sold or served to customers under the name fruit jam and in such a manner that it purports to be, or is represented to be fruit jam.[6]

The judgment is reversed and the cause remanded with instructions to enter a judgment for condemnation.

PICKETT, Circuit Judge, dissenting.

Section 341 of the Federal Food, Drug and Cosmetic Act of 1938[1] gives the Federal Security Administrator authority to promulgate regulations fixing and establishing for any food a reasonable definition and standard of identity. The government's position in this case is that "irrespective of what an article of food may consist or the nature of its labeling," it violates the Act "if it purports to be a food for which a definition and standard of identity * * * has been prescribed and does not conform thereto." It says "the fact that the article may or may not be an imitation, or labeled as such, has no bearing * * * upon the question as to whether or not it violates Section 343(g)." It frankly stated to the court that the purpose of this libel was to establish a principle which would bar from interstate trade all substandard or imitation foods regardless of the label if they purported to be foods for which standards had been prescribed. It construed the word "pur-

5. Libby, McNeill & Libby v. United States, 2 Cir., 148 F.2d 71, 73.

6. In Sen.Rep. 361, 74th Cong., 1st Sess., p. 8, the following appears:
"It should be noted that the operation of this provision [Section 343(g)] will in no way interfere with the marketing of any food which is wholesome but which does not meet the definition and standard, or for which no definition and standard has been provided; but if an article is sold under a name for which a definition and standard has been provided, it must conform to the regulation. This does not preclude the use of

distinctive individual brands. But the loophole afforded the dishonest manufacturer by the so-called 'distinctive name' proviso of the present law will be closed. Under that proviso adulterated and imitation products sold under such names were immune from action. It is not intended that the authorization to make standards of identity shall apply to foods which are truly proprietary, that is, foods distinctive in content as well as in name, in the manufacture of which some person or concern has exclusive proprietary rights." *(Boldface ours.)*

1. Title 21 U.S.C.A. § 341.

port" to mean any food which looks and tastes like and is sold and used for the same purpose as that food for which standards are fixed.

If the Government's construction of the statute is correct, then no form of label would permit entry of the seized product into the channels of interstate trade. If its sale is permitted under any form of label it would still look and taste like standard jam, it would be sold and used for the same purpose as standard jam, it would still be purchased and served as jam by hotels and restaurants, it would still be purchased and used as jam by ranchers, logging camps and large families looking for a cheaper but nutritious and wholesome food. To me there is no middle ground; we either accept or reject the government's position. If the product is permitted to be sold under some descriptive label or by a distinctive name, although not meeting the standards, the same objections will be advanced as they were to the "Bred Spred" case. U. S. v. Ten Cases, more or less, Bred Spred, 8 Cir., 49 F.2d 87.[2]

It is clear to me that the very purpose of Section 343(c) [3] is to permit on the market a wholesome and nutritious food which is within the means of a great mass of our people who are unable to purchase the standard products. At the time the bill was being considered by Congress, the Food and Drug Administration so recognized the necessity for such products.[4] Senator Copeland who sponsored the bill recognized the right to sell substandard foods, said, "It should be noted that the operation of this provision will in no way interfere with the marketing of any food which is wholesome but which does not meet the definition and standard, or for which no definition and standard has been provided." Dunn, Federal Food, Drug and Cosmetic Act, page 246. The administrator construed the Act to permit a substandard article to be labeled

2. The distinctive name provision was left out of the 1938 Act because of this and similar decisions. H. Rep. No. 2139, 75th Cong. 3 Sess., p. 5.

3. Title 21 U.S.C.A. § 343(c): "If it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated."

4. Walter G. Campbell, Chief of the Food and Drug Administration, testifying before a subcommittee in the House of Representatives in connection with this identical type of product, said:

"Mr. Kenney. What is the other ingredients besides the fruit?

"Mr. Campbell. There is fruit, sugar, and pectinous material acquired from fruit, which is just a gelatinizing agent, that enables you to incorporate large quantities of water, all in lieu of the one-fourth amount of fruit deficient in that product as compared with the standard preserve. So that water and pectin have been substituted. * * *

"Mr. Chapman. What effect would the provision of Senate 5 have on the manufacture and sale of a product like that?

"Mr. Campbell. Senate 5 provides for standards. That product would be a substandard article and its marketing as a preserve would be proscribed.

"Mr. Chapman. That would be shown on the label?

"Mr. Campbell. It would have to be shown on the label just what it was, and enable the consumer to buy it for what it was.

"There can be no objection to the philosophy that any article that is wholesome and has food value and is sold for what it is, without deception, should be permitted the channels of commerce. There can be no objection to that article with its deficiency of fruit if every consumer knows exactly what he is buying.

"There can be no objection to the sale of skimmed milk if the buyer knows that it is skimmed milk when he is buying it.

"Mr. Chapman. It contains no injurious ingredient?

"Mr. Campbell. It contains no injurious ingredient. But the point that it illustrates, Mr. Chairman, is that the distinctive trade name proviso, which I read to you in the present act, offers a means by which a complete circumvention of the requirements of that law can be effected.

"S.5 is silent on distinctive names. It eliminates that particular provision which, as I said, is a sin of commission." Hearing before a Subcommittee on Interstate and Foreign Commerce, House of Representatives, 74th Congress, 1st Session, H.R. 6906, H.R. 8805, H.R. 8941 and S. 5. Dunn, Federal Food, Drug and Cosmetic Act, page 1239.

as an "imitation" at least as late as 1941 and took no different view until 1945. Kleinfeld & Dunn, Federal Food, Drug and Cosmetic Act 1938–1949, pp. 627, 712. Until this action was brought the label on products of the claimant was never questioned by the Administrator, in fact it is the label suggested by him. He does not question its sufficiency now. It was designed to meet the requirements of 343(c) by showing that the product did not meet the standards but was an imitation. No other word or combination of words in the English language could be used which would so well call to the attention of the purchasing public the fact that the labeled food was not a standard product. It is a word of common usage and understanding. Webster defines it to mean: "the form of something regarded as a pattern or model * * * an artificial likeness * * * simulating something superior, esp. something more costly." Necessarily any imitation would have the appearance of that which it imitates. In this case the jam did look and taste like that which meets the prescribed standard but it is labeled "imitation" in the manner required by the statute. If the section is not given this construction it is meaningless.

The government relies strongly upon the Quaker Oats decision in the Supreme Court [5] and the Catsup case in the Second Circuit.[6] These cases involved foods which were being sold as standard products. Each recognized that informative labeling could be used *"where the food did not purport to comply with a standard."*

A large portion of the food consumed today comes within the provisions of the Act. To sustain the government's position here gives the Federal Security Administrator absolute control over the ingredients of all such foods. He will have the right to standardize the same, which will mean virtually a standardization of the price. It will remove from the market a nutritious and wholesome food which sells for approximately one-half the price of the standard product. The purchasing public, re-gardless of their ability to pay, will be forced to purchase the same quality of food. I cannot believe Congress had any such intent. I would affirm the trial court.

5. Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S. Ct. 589, 596, 87 L.Ed. 724, 158 A.L.R. 832.

6. Libby, McNeill & Libby v. U. S., 2 Cir., 148 F.2d 71.