## UNITED STATES v. 30 CASES, MORE OR LESS, LEADER BRAND STRAW-BERRY FRUIT SPREAD, etc.

### Civ. A. No. 1–74.

United States District Court
S. D. Iowa, Central Division.

Nov. 4, 1950.

. Wm. R. Hart, U. S. Atty., Iowa City, Iowa, Cloid I. Level, Asst. U. S. Atty., Des Moines, Iowa, William R. Sheridan, Asst. U. S. Atty., Keokuk, Iowa, for libelant.

Arthur L. Israel, Chicago, Ill., and Don E. Neiman, Des Moines, Iowa, for libelee.

SWITZER, District Judge.

This suit seeks to condemn articles of food under the provisions of Section 342 (b) (4) and Section 343(g) (1), Title 21 U.S.C.A., and the regulations promulgated by the Federal Security Administrator, pursuant to Section 341, Title 21, U.S.C.A., upon the claim that the foods in question were adulterated and misbranded when introduced into and while in interstate commerce.

Claimant made answer, admitting that the articles involved were "Foods" within the meaning of the Act, that these articles were shipped in interstate commerce, that definitions and standards of identity have been prescribed for strawberry, peach and apricot jams, and that the foods here involved do not conform to such definitions and standards.

Claimant denies that the articles are misbranded or adulterated, claiming that the articles seized do not purport to be anything else than "strawberry fruit spread", "peach fruit spread", and "apricot fruit spread," being plainly labeled with a list of all the ingredients in the order of their predominance and being clearly and plainly distinguishable from jams or preserves of the same flavor.

Claimant further affirmatively contends that the standards promulgated by the Administrator for jams and preserves do not apply to the articles here seized, in that, these foods are distinctive in content as well as in name, in the manufacture of which it has exclusive proprietary rights.

Claimant's answer further—"reserves the right to contest the validity of such

definitions and standards as is provided for in Section 701(e) (6) of the Act." No evidence having been adduced in support of this last affirmative defense and no authorities shown in behalf thereof, no further consideration will here be given thereto.

The products seized were uniform 2 lb. glass jars which claimant sold to wholesale grocers and retail stores, which jars and lids are typical of the type used in packaging standard jams and preserves in the industry. The labels used are typical in appearance with standard jams, preserves and jelly labels, known in the industry as "spot labels". There appears no element of dissimilarity between the labels upon the seized articles and those customarily used on standard jams, preserves and jellies. The labels bore the words—

"Leader Brand
Strawberry Fruit Spread"

"Leader Brand
Peach Fruit Spread"

"Leader Brand
Apricot Fruit Spread"

below which appeared in small type a list of the ingredients, but with no statement or notation as to the percentages of each.

The general appearance of the jar in each of these articles is similar as to color and consistency with similar sized jars of standard preserves and jams. It is true that each of the flavors seized was somewhat lighter in color and thinner in consistency than the related standard jams and preserves, but not so much so as to be discernible or apparent unless held up to the light and carefully observed. One of claimant's own witnesses, when confronted on cross examination, found himself unable to correctly distinguish between strawberry fruit spread and standard strawberry jam, although, on direct examination, the witness had stoutly maintained he was easily able to do so.

I must conclude that to the ordinary housewife or purchaser of the product from the grocer's shelf, no difference would ordinarily be detected between the products seized and the standard jams and preserves.

It was further shown by a preponderance of the evidence that the claimant on one occasion referred to these articles in its invoice as. "95 Cs preserves 3,040 lbs;" that at least one wholesale grocer likewise at times invoiced the articles in question in the same manner; that as late as March 20, 1950, the sales dodgers distributed to the retail trade by at least one wholesale grocer referred to the Leader Brand products as "fruit jam spread"; and in at least one newspaper advertisement by a retail store the following wording appeared in the ad in connection with one of the condemned articles: "Leader Brand Strawberry Jam"; and in some instances retail grocers themselves were confused as to whether these items were or were not jam.

The evidence discloses that the foregoing representations did not constitute the universal practice, but I must conclude that the showing made does establish by a preponderance of the evidence that there was a substantial amount of actual representation of these seized items to be jams and preserves.

Additionally, it was established without substantial controversy that the Leader Brand products were universally placed by retail grocers for display and sale in their stores in the jams, preserves and jelly shelf section thereof, with no notice of any kind to the unwary and inexperienced purchaser of any differential or distinction between the Leader Brand Products and the standard jams and preserves as to quality.

It is contended by the claimant that the very fact that a two-pound jar of the Leader Brand Product sold at a much lesser retail price than a comparatively sized jar of a standard jam or preserve should have been notice in and of itself. I cannot subscribe to this view. This court must notice modern merchandising methods which frequently make it possible for consumers to buy commodities below the cost price to the retailer himself, a fact well known to the ordinary housewife. Further, it is a matter of common knowledge that since the enactment of the Food, Drug & Cosmetic Act of 1938, 21 U.S.C.A. § 301 et seq., consumers of food products have come

more and more to rely upon the uniform quality of standardized commodities, generally the effect of which is to make all less wary and more credulous. Indeed, the brand name itself—"Leader Brand"—appearing in bold print on the label gives further credence to the belief by many that the cheapness of the price of this product was due to the fact that it was a leader article.

Upon the question of adulteration, it should be noticed that the standard admittedly fixed for jams and preserves by the Administrator requires 45 per cent. fruit by weight and 55 per cent. sugar by weight, whereas the formula of composition under which the condemned articles were manufactured is as follows:

100 pounds of fruit
100 pounds of sugar
68.5 pounds of corn syrup
80 fluid ounzes of 50% citric acid solution
170 pounds of pectin solution.

The batch is then cooked to 68% soluble solids content. Both standard jams and Leader Brand products contain 32% water. However, in the manufacture of standard jams no water is introduced from the tap, whereas in Leader Brand Products 22.8% of the water remaining in the product comes from the tap.

Section 342 (b), Title 21 U.S.C.A., provides that—"A food shall be deemed to be adulterated * * * (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight * * * or make it appear better or of greater value than it is."

A simple and direct application of the plain wording of the statute would seem to compel a conclusion that if the condemned articles purported to be standardized jams and preserves and were represented as such to the retail trade, that they were adulterated within the meaning of the last above quoted statute.

Having therefore concluded that the condemned foods were in fact "represented" as strawberry jam, peach jam and apricot jam, there remains but one issue for determination by the court, apart from the af-firmative defense which will be later considered, that is, whether the condemned foods "purport" to be strawberry jam, peach jam and apricot jam, within the meaning of Section 343 (g)(1) of Title 21 U.S.C.A.

■ Both the legislative history and judicial interpretations of the Federal Food, Drug and Cosmetic Act disclose that the primary purpose and aim of Congress in enacting this important piece of legislation was not the protection of the merchants and traders, but rather the protection of the consuming public.

The House Committee on Interstate and Foreign Commerce, in reporting on S. 5, a precursor to the bill which was enacted into law, summed up the purpose of the proposed law in the following manner:

"This act seeks to set up effective provisions against abuses of consumer welfare growing out of inadequacies in the Food and Drugs Act of June 30, 1906, as amended [21 U.S.C.A. § 1 et seq.].

"While the old law has been of incalculable benefit to the American consumers, it contains serious loopholes and is not sufficiently broad in its scope to meet the requirements of consumer protection under modern conditions." H. Rep. No. 2139, 75th Cong. 3d Sess. p. 1.

The Supreme Court in speaking of the purpose of the Act state: "The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." U. S. v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48. See U. S. v. Antikamnia Chemical Co., 231 U.S. 654, 665, 34 S.Ct. 222, 58 L.Ed. 419; U. S. v. Two Bags, Each Containing 110 Pounds, Poppy Seeds, 6 Cir., 147 F.2d 123.

■ To correctly interpret Section 343 (g), Title 21 U.S.C.A., with reference to whether an article of food in fact purports to be or is represented as a standardized article to the ultimate consumer, the

criteria is the measurement of the effect of the article upon an ordinary as distinguished from an overly skeptical or critical buyer. The Act was not designed to protect the critical consumer; rather its purpose is—"to protect the public, the vast multitude which includes the ignorant, the unthinking, and the credulous who, when making a purchase, do not stop to analyze." U. S. v. 62 Packages, More or Less, of Marmola Prescription Tablets, D.C., 48 F.Supp. 878, 887, affirmed 7 Cir., 142 F.2d 107; certiorari denied, 323 U.S. 731, 65 S.Ct. 68, 89 L.Ed. 587. See also U. S. v. 43½ Gross Rubber Prophylactics, etc., D.C., 65 F.Supp. 534, 537, affirmed, Gellman v. U. S., 8 Cir., 159 F.2d 881, where the court referred to the congressional purpose of—"protecting the uninformed from buying an article which was different from what it purported to be."

■ It is well established that the Federal Food, Drug & Cosmetic Act is remedial legislation and should be liberally construed so as to carry out its beneficent purpose; U. S. v. Dotterweich, supra; Pasadena Research Lab's, Inc. v. U. S., 9 Cir., 169 F.2d 375, certiorari denied 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401; Research Lab's, Inc. v. U. S., 9 Cir., 167 F.2d 410, certiorari denied 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393; U. S. v. Two Bags, Each Containing 110 Pounds, Poppy Seeds, 6 Cir., 147 F.2d 123; C. C. Co. v. U. S. on rehearing, 5 Cir., 147 F.2d 820; and whether the deception or misleading is willful is immaterial in this case. Adulterated or misbranded foods are subject to seizure and condemnation under the Act without regard to the manufacturer's intent. See U. S. v. 75 Cases, More or Less Each Containing 24 jars of Peanut Butter, 4 Cir., 146 F.2d 124, certiorari denied 325 U.S. 856, 65 S.Ct. 1183, 89 L.Ed. 1976, and U. S. v. Two Bags, Each Containing 110 Pounds, Poppy Seeds, supra.

Claimant asserts that the articles under seizure do not "purport" to be preserves, jams or jellies.

■ In considering the scope of Sec. 343(g), 21 U.S.C.A., the word "purport" should be given its usual, ordinary meaning. Webster's New International Dictionary, 2d Ed., defines "purport" as follows: "To convey, imply, or press outwardly, as one's (esp. a thing's) meaning, intention, or true character; to have the appearance, often specious appearance, of being, intending, claiming, etc. (that which is implied or inferred); * * *" This definition was relied upon in U. S. v. 306 Cases Containing Sandford Tomato Catsup With Preservative, D.C., 55 F.Supp. 725, 727, affirmed Libby, McNeill & Libby v. U. S., 2 Cir., 148 F.2d 71, which is a case based upon much the same issues as are here involved.

■ The common and ordinary meaning of "misbranding" as related to foods has to do with names, statements and declarations appearing on the label. "Misbrand" is defined in Webster's New International Dictionary, 2d Ed., as—"To brand falsely; spec., to brand as containers of drugs or foodstuffs, in contravention of statutory requirements." Synonyms of "brand" are given by the same source as, "stamp, mark, label."

■ Section 343(g), Title 21 U.S.C.A., provides however its own glossary on misbranding. U. S. v. Forty Barrels and Twenty Kegs of Coca Cola Co., 241 U.S. 265, 277, 36 S.Ct. 573, 60 L.Ed. 995. Under the definition set out in the Act a food may be "misbranded" with a label which meets every label provision of the Act and truthfully describes the article. This definition of misbranding does not look to the label or the marking on the food for its interpretation, but turns on the factual issue of whether a particular food "purports to be" or "is represented as" a food for which a definition and standard of identity has been promulgated. If the facts reveal, as in the instant case, that it does so purport to be, then the law requires that the article comply with the established standard of identity of the food it purports to be. Otherwise it is misbranded.

■ Additionally, Section 343(d), Title 21, U.S.C.A., provides that a food shall be "misbranded"—"if its container is so made, formed, or filled as to be misleading." It follows therefore that a label can be in all respects truthful as to the quantity and nat-

ural components of the contents of the container and yet the article is "misbranded" nevertheless, if its container is so filled as to lead an ordinary consumer to the belief that the contents are a standardized product.

If the court therefore were to permit Section 343(g) to be circumvented by the simple device of using truthful labels on a product which does not conform to a definition and standard of identity but conveys the impression (purports) that it is a food for which the definition and standard has been prescribed, the effectiveness of the Section, and the salutary features of food standardization, would be destroyed. That the Congress intended the integrity of the identity of standards to be upheld and that they be applied without variation is clear from the pattern of the Federal Food, Drug & Cosmetic Act itself. The use of a statement on the label that an article of food falls below the standard of quality, or below the standard of fill of the container is permitted under Section 343(h) (1) and (2), but no such permission is granted in Section 343(g), (1), where the article of food fails to conform to the applicable standard of identity. The very fact that the Congress specifically provided for the use of a substandard label in respect to Section 343(h), Title 21, U.S.C.A., but made no similar provision with respect to Section 343(g), reveals the congressional design not to permit a food which purports to be a product which has been defined or standardized, but does not conform thereto, to be exempted by means of informative labeling. U. S. v. 716 Cases, More or Less, etc., Del Comida Brand Tomatoes, 10 Cir., 179 F.2d 174. The distinction is also pointed out in the following excerpts from congressional committee reports:

"Definitions and standards of identity are provided under which the integrity of food products can be effectively maintained. * * * H.Rep.No.2755, 74th Cong. 2nd Sess., p. 4; H.Rep.No.2139, 75th Cong. 3d Sess., p. 2; See Dunn, "Federal Food, Drug and Cosmetic Act", pp. 553, 816.[1]

The maintenance of the integrity of a food product patently deals with the food itself, not merely its labeling.

The correctness of the conclusions above reached is further emphasized by the legislative history recognizing the necessity for standards of identity to eliminate distribution of debased and cheapened food products made possible by the "distinctive name" proviso of Section 10 of the 1906 Food & Drug Act, Sec. 10, Title 21 U.S.C.A., repealed June 25, 1938.

In U. S. v. 10 Cases, More or Less, Bred Spred, 8 Cir., 49 F.2d 87, the government proceeded under the Food and Drug Act of 1906 against a product sold under the name of "Bred Spred" which resembled jam but contained only one-half of the normal fruit content as measured by trade and household practice. The Court of Appeals affirmed a directed verdict for the claimant, holding the product to be neither adulterated nor misbranded. The House Committee of Interstate and Foreign Commerce in reporting on the bill which was enacted as the Federal Food, Drug & Cosmetic Act of 1938, referred to this decision, H. Rep. No. 2139, 75th Cong. 3d Sess., p. 5, accompanying S. 5, as follows:

"Section 401 (21 U.S.C. 341 [21 U.S.C.A. § 341]) provides much needed authority for the establishment of definitions and standards of identity and reasonable standards of quality and fill of container for food. One great weakness in the present food and drugs law is the absence of authoritative definitions and standards of identity except in the case of butter and some canned foods. The government repeatedly has had difficulty in holding such articles as commercial jams and preserves and many other foods to the time honored standards employed by housewives and reputable manufacturers. The housewife makes preserves by using equal parts of fruit and sugar. The fruit is the expensive ingredient, and there has been

---

1. Many of the committee reports and hearings in connection with the Act are difficult to obtain. Since Dunn's work is the standard compilation of the legislative history of the Act and is readily available in law libraries, it is cited for that reason and will be hereinafter referred to as "Dunn's".

a tendency on the part of some manufacturers to use less and less fruit and more and more sugar.

"The Government has recently lost several cases where such stretching in fruit was involved because the courts held that the well-established standards of the home, followed also by the great bulk of manufacturers, is not legally binding under existing law." Dunn, p. 819.

This quotation from the congressional reports demonstrates the congressional intent to render the "Bred Spred" decision inapplicable through the effect of the identity standard provisions of the 1938 Act.[2]

The courts before which the problem has been presented have held consistently that the label of a food is not the controlling factor in determining whether under the 1938 Act an article "purports" to be a standardized food. See Federal Security Administrator v. Quaker Oats Co., 318 U. S. 218, 63 S.Ct. 589, 87 L.Ed. 724; U. S. v. 306 Cases, Containing Sandford Tomato Catsup With Preservatives, D.C., 55 F. Supp. 725, affirmed Libby, McNeill & Libby v. U. S., 2 Cir., 148 F.2d 71.

Claimant cites U. S. v. 99 Cases, etc., Southland Fountain Fruit, D.C.E.D.Tenn., 89 F.Supp. 992. Since the dictum would seem to modify to some extent the conclusions hereinabove reached, it should be noted that this court in a supplemental memorandum filed Oct. 27, 1949, deleted from its original opinion the portion upon which claimant relies.

Claimant also cites U. S. v. 62 Cases, More or Less, Containing Six Jars of Jam, D.C.N.M., 87 F.Supp. 735, which involved the same misbranding charge as is here involved. This case was reversed on appeal on June 27, 1950. 10 Cir., 183 F.2d 1014.

■ In the instant case the ingredients contained in the articles are wholesome, nutritious, and palatable and on the whole much less expensive than a like quantity of standardized jams or preserves, still from the formula above set forth, it is at once apparent that the product has been cheapened by the inclusion of many ingredients and by the sharp reduction in the use of fruit therein, not permitted under the standard promulgated for jams and preserves. Notwithstanding this adulteration, these products have the general appearance of standardized jams. They are packaged similarly, labeled similarly, are exhibited for sale on the merchant's shelves by the side of and in the midst of standardized jams, preserves and jellies, and, in general, constitute themselves to the uncritical, the unsuspecting and the unwary as a standardized jam or preserve, and because of comparative costs, appear to be a bargain.

■ I must further hold that the claimant failed to establish by a preponderance of the evidence that the term "Fruit Spread" which appears on the label has any recognized meaning as a food product separate and distinct from a standard jam. To the contrary, I must conclude from the evidence that if the term "Fruit Spread" has any meaning at all to the ordinary, average consumer, that it means jams, preserves, jellies, fruit butter, or marmalade—those standardized food commodities which consumers are accustomed to use as a spread for bread or other bakery products. Under the holding and reasoning contained in Federal Security Administrator v. Quaker Oats Co., supra, and the other cases cited in this opinion, the claimant here cannot be heard to say that its product "Leader Brand Fruit Spreads" are in any sense proprietary or are in any degree foods distinctive in content as well as in name, in which the manufacturer, claimant here, has exclusive proprietary rights.

In the preserve industry and in the trade, the term "Fruit Spread" means standardized jams, preserves, jellies, fruit butter or marmalade, exactly as it does to the consuming public.

2. That the Congress was fully apprised of the serious consequences of the Bred Spred case when it deliberately undertook to counteract them by the 1938 Act is clearly shown in the hearings on legislative proposals which became the Federal Food, Drug and Cosmetic Act. See Dunn, pp. 1051-2.